## MONONGAHELA NAVIGATION COMPANY *v.* UNITED STATES.

APPEAL FROM AND ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF PENNSYLVANIA.

No. 722.   Argued October 25, 26, 1892. — Decided March 27, 1893.

In the proceedings taken under the act of August 11, 1888, 25 Stat. pp. 400, 411, c. 860, to condemn lock and dam No. 7 of the Monongahela Navigation Company, that company is entitled under the provisions of the Fifth Amendment to the Constitution, to recover compensation from the United States for the taking of the franchise to exact tolls, as well as for the value of the tangible property taken.

The assertion by Congress of its purpose to take the property which that company had constructed in the Monongahela River by authority of the State of Pennsylvania did not destroy the franchise granted to the company by the State.

*Bridge Company* v. *United States,* 105 U. S. 470, distinguished from this case.

By the act of August 11, 1888, 25 Stat. 400, 411, c. 860, Congress, among other things, enacted:

"The Secretary of War be, and is hereby, authorized and directed to negotiate for and purchase, at a cost not to exceed one hundred and sixty-one thousand, seven hundred and thirty-three dollars, and thirteen cents, lock and dam number seven, otherwise known as 'the Upper Lock and Dam,' and its appurtenances, of the Monongahela Navigation Company, a corporation organized under the laws of Pennsylvania, which lock and dam number seven and its appurtenances constitute a part of the improvements in water communication in the Monongahela River, between Pittsburgh, in the State of Pennsylvania, and a point at or near Morgantown, in the State of West Virginia.   And the sum of one hundred and sixty-one thousand, seven hundred and thirty-three dollars and thirteen cents, or so much thereof as may be necessary, is hereby appropriated, out of any moneys in the Treasury not otherwise appropriated, for consummating said purchase, the same

to be paid on the warrant of the Secretary of War, upon full and absolute conveyance to the United States of the said lock and dam number seven, and its appurtenances, of the said Monongahela Navigation Company.

"In the event of the inability of the Secretary of War to make voluntary purchase of said lock and dam number seven and its appurtenances for said sum of one hundred and sixty-one thousand, seven hundred and thirty-three dollars and thirteen cents, or a less sum, then the Secretary of War is hereby authorized and directed to institute and carry to completion proceedings for the condemnation of said lock and dam number seven and its appurtenances, said condemnation proceedings to be as prescribed and regulated by the provisions of the general railroad law of Pennsylvania, approved February nineteenth, eighteen hundred and forty-nine, and its supplements, except that the United States shall not be required to give any bond, and except that jurisdiction of said proceedings is hereby given to the Circuit Court of the United States for the Western District of Pennsylvania, with right of appeal by either party to the Supreme Court of the United States : *Provided,* That in estimating the sum to be paid by the United States, the franchise of said corporation to collect tolls shall not be considered or estimated ; and the sum of five thousand dollars, or so much thereof as may be necessary, is hereby appropriated, out of any moneys in the Treasury not otherwise appropriated, to pay the necessary costs of said condemnation proceedings ; and upon final judgment being entered therein the Secretary of War is hereby authorized and directed to draw his warrant on the Treasury for the amount of said judgment and costs, and said amount for the payment thereof is hereby appropriated out of any moneys in the Treasury not otherwise appropriated. And when said lock and dam number seven and its appurtenances shall have been acquired by the United States, whether by purchase or condemnation, the Secretary of War shall take charge thereof, and the same shall thereafter be subject to the provisions of section four of an act, entitled 'An act making appropriations for the construction, repair and preservation for certain public work on rivers

and harbors, and for other purposes,' approved July fifth, eighteen hundred and eighty-four."

The effort at a voluntary purchase failing, on December 1, 1888, proceedings of condemnation were commenced in the Circuit Court of the United States for the Western District of Pennsylvania. Viewers were appointed, who reported the value of the lock and dam number seven to be $209,393.52. Such valuation did not take into account the franchise of the company to collect tolls. An appeal was taken, as provided by the statutes of Pennsylvania, which appeal gave the right to a trial *de novo*, according to the course of the common law. A jury having been waived, the matter was tried before the court, the Navigation Company being the plaintiff as to the question of amount of compensation. These facts appeared on the trial:

"In 1836, the State of Pennsylvania incorporated and by acts in that and subsequent years granted to the Monongahela Navigation Company the right 'to enter upon the said river Monongahela and upon the lands on either side, and to use the rocks, stone, gravel or earth which may be found thereon in the construction of their works, . . . and to form and make, erect and set up any dams, locks or any other device whatsoever which they shall think most fit and convenient, to make a complete slack-water navigation between the points herein mentioned, to wit: the city of Pittsburgh and the Virginia State line.'

. "The Monongahela River rises in the mountains of West Virginia, flows northwardly through Pennsylvania to Pittsburgh, where it forms a junction with the Allegheny and Ohio Rivers.

"In pursuance of its charter the Navigation Company, between 1841 and the present time, has constructed in said river seven locks and dams, which together now carry the slack-water navigation as far as the West Virginia State line.

"Prior to the construction of said company's works, that is to say, prior to the year 1841, the navigation of the Monongahela River was conducted altogether in small vessels, including small steamboats of not exceeding a tonnage of fifty

tons, which could not ascend the river at all seasons, but only during limited periods, depending on the rise in the river. The trade or commerce on said river, prior to its improvement by said company's works, was small, particularly in the article of coal, for which the river in its natural condition did not furnish sufficient harbors or places of shipment at all seasons of the year; but by the construction and maintenance of said company's works there has been created an existing navigation for large steamboats at all seasons of the year, and facilities for a large commerce, particularly in the article of coal, of which there is now transported in a single day as much as was, before the construction of the company's works, transported in an entire year.

"The construction of the lock and dam No. 7, the property attempted to be appropriated in this proceeding, by the Monongahela Navigation Company, was begun in the year 1882 and completed in 1884, being the last one built, and completing the company's improvements in the State of Pennsylvania.

"The work was commenced under the following circumstances:

"It was provided by an act of the legislature of Pennsylvania, constituting a supplement to the company's charter, approved April 8, 1857, that whenever the construction of sufficient locks and dams to extend the slack water on the Monongahela River from the Pennsylvania State line to Morgantown, in Virginia, shall have been commenced, it shall be the duty of the Monongahela Navigation Company to commence the construction of lock and dam No. 7 in such manner and on such plan as will extend the navigation from its present terminus to the Virginia State line, and complete the same simultaneously with the completion of the work extending to Morgantown."

On March 3, 1881, Congress passed an act, 21 Stat. 468, 471, c. 136, among other things appropriating $25,000 for improving the Monongahela River in West Virginia and Pennsylvania with this proviso:

"But this sum shall not be expended until the Monongahela Navigation Company shall have undertaken in good faith the

building of lock and dam number seven at Jacob's Creek, and until said company shall, in manner satisfactory to the Secretary of War, give assurance of their ability and purpose to complete the same."

After the passage of this act, and on March 24, 1881, Colonel Wm. E. Merrill, the engineer and officer in charge of the public works of the United States on the river Monongahela, addressed this letter to the Navigation Company:

"U. S. ENGINEER'S OFFICE, CUSTOM-HOUSE,

"CINCINNATI, O., *March* 24, 1881.

"Hon. J. K. MOORHEAD, *President Mon. Nav. Co., Pittsburgh, Pa.*

"SIR: The last river and harbor bill contains the following appropriation:

"' Improving Monongahela River, West Virginia and Pennsylvania, $25,000, but this sum shall not be expended until the Monongahela Navigation Company shall have undertaken in good faith the building of lock and dam number seven, at Jacob's Creek, and until said company shall, in manner satisfactory to the Secretary of War, give assurance of their ability and purpose to complete the same.'

"You will, therefore, see that my work on number eight is wholly dependent on your work on number seven.

"I have, therefore, to urge on your company that you will, at the earliest date possible, 'undertake in good faith the building of lock and dam number seven,' and that you will give the Secretary of War satisfactory assurance of your ability and purpose to complete it.

"I would, therefore, suggest that it might be useful for your secretary to communicate at once to the Secretary of War such facts as to the financial resources of the company and its intentions about number seven as will satisfy him on the points specially left to his discretion, and unlock the appropriation so that it may be used this summer.

"Respectfully, your obedient servant,

"WM. E. MERRILL,

"*Maj. Eng'rs & B'v't Col.*"

Whereupon, and on April 6, 1881, the following resolutions were passed by the Navigation Company, notice of which was given to the Secretary of War:

" Whereas Congress has made an appropriation for the commencement of the building of lock and dam number eight in the Monongahela River, the payment of which appropriation is made to depend upon the Secretary of War being satisfied of the *bona fide* intention of this company to construct lock and dam number seven, and of their financial ability to complete the same; and

" Whereas Col. Merrill, of the United States engineers, in charge of the government improvement of the Monongahela River, has requested this company to furnish the Secretary of War with satisfactory assurances in relation thereto: Therefore

"*Resolved,* That it is the *bona fide* purpose and intention of this company to construct lock and dam number seven in the Monongahela River in the manner and at the time required of them by the acts of assembly of the State of Pennsylvania — that is to say, so to complete said lock and dam number seven that the same shall be ready for use as soon as the requisite locks and dams above lock and dam number seven, constructed or about to be constructed by the Federal Government, shall also be finished and ready for use, so as to complete the slack water of said river from Pittsburgh, Pennsylvania, to Morgantown, Virginia.

"*Resolved,* That the secretary of this company be directed to forward a copy of the foregoing resolution, together with copies of the company's annual report showing the intention of the company and their ability to complete this work, to Col. Merrill and also to the Secretary of War."

And on May 4, 1881, Col. Merrill addressed the following letter to the President of the Navigation Company :

" SIR: I have just received official notice from the Secretary of War, through the Chief of Engineers, that the resolution and documents relative to the construction of lock and dam No. 7, on the Monongahela River, forwarded to this

office by your company in April last, (duplicate sent to the honorable Secretary of War,) have been considered as fully meeting the requirements of the proviso in the last appropriation for the improvement of the above-named river, prohibiting the expenditure of the money appropriated, ' until the Monongahela Navigation Company shall have undertaken in good faith the building of lock and dam No. 7 at Jacob's Creek, and until said company shall, in a manner satisfactory to the Secretary of War, give assurance of their ability and purpose to complete the same.' "

Thereafter, and in 1882, lock and dam number seven were commenced and completed in 1884. In the course of the trial the company called a witness, and offered to prove by him and other witnesses :

" That the paid-up capital stock of the Monongahela Navigation Company consists of thirty-two thousand, six hundred and thirty-nine shares of fifty dollars; that dividends have been declared on the stock for a number of years at the rate of twelve per cent per annum.

" That the tolls received by the said company for the use of its works, including lock and dam No. 7, have averaged for several years past not less than $240,000; that the market value of the stock was at the time of the inception of these proceedings about $100 per share; that the money value of their entire works and franchise is not less than $4,000,000; that the actual toll receipts of lock and dam No. 7 for several years past have exceeded $2800 per annum, and that a very large increase of such toll receipts at lock and dam No. 7 will certainly take place in a short time by the development of coal mines naturally tributary to said lock and dam.

" That by the construction and maintenance of the company's works a permanent and reliable public highway has been created on which a large and increasing carriage of coal and general merchandise takes place, and that permanent navigation for the largest vessel and steamboat now exists from the city of Pittsburgh, Pennsylvania, to or near the line between the States of Pennsylvania and West Virginia.

" That in view of the present and prospective tolls receivable

at lock and dam No. 7, the present value of said lock and dam No. 7 is not less than $450,000, said value being predicated upon said present and prospective tolls; that said lock and dam No. 7 are a portion of said company's works, which consist of seven dams, each furnished with a lock or locks.

" That the navigation which is sought by these proceedings to be made free was mainly created and made possible at all seasons by the construction and maintenance of the company's works.

" That a large portion of the tolls received by the company is charged upon merchandise and articles carried between points of shipment and delivery entirely within the State of Pennsylvania, and constituting internal commerce of said State, and that a portion of the tolls collectible at lock and dam No. 7, for the use of said lock and dam, is chargeable for merchandise, goods and passengers carried between points of shipment and delivery in the State of Pennsylvania, the transportation being wholly within the State as to said portion.

" To which offer of testimony counsel for the United States objected, for the reason that the same was incompetent and irrelevant; whereupon the court sustained the objection and rejected the evidence."

The result of the trial was a finding by the court that the value of the lock and dam number seven was $209,000, " not considering or estimating in this decree the franchise of this company to collect tolls." Such amount was the sum adjudged and decreed to be paid by the United States to the Navigation Company for the property condemned. The company brought the case to this court by both writ of error and appeal.

*Mr. Wayne McVeagh* and *Mr. Johns McCleave*, (with whom was *Mr. Thomas D. Carnahan* on the brief,) for appellant and plaintiff in error, cited *Cardwell* v. *American Bridge Co.*, 113 U. S. 205; *Willson* v. *Blackbird Creek Marsh Co.*, 2 Pet. 245; *Pound* v. *Turck*, 95 U. S. 459; *Huse* v. *Glover*, 119 U. S. 543; *Sands* v. *Manistee River Improvement Co.*, 123 U. S. 288; *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420; *Pennsylvania Railroad* v. *Balt. & Ohio Railroad*, 60

Maryland, 263; *Commonwealth* v. *Pittsburgh & Connellsville Railroad,* 58 Penn. St. 26 ; *Isom* v. *Miss. Central Railroad,* 36 Mississippi, 300 ; *United States* v. *Great Falls Mfg. Co.,* 112 U. S. 645 ; *Bridge Company* v. *United States,* 105 U. S. 470 ; *County of Mobile* v. *Kimball,* 102 U. S. 691 ; *Packet Co.* v. *Keokuk,* 95 U. S. 80; *Montgomery County* v. *Schuylkill Bridge Co.,* 110 Penn. St. 54.

*Mr. Attorney General* and *Mr. Solicitor General* for appellees and defendants in error.

The principal question at bar is whether the proviso in the River and Harbor Act of August 11, 1888, is valid.   This question was raised in various forms upon the trial, the contention of the appellant being that the franchise is no less property than the material structure of the lock and dam, and that therefore the same cannot be taken or destroyed by the government, directly or indirectly, without compensation. On behalf of the government, on the contrary, it was claimed by the district attorney, and held by the court, that the right of the United States to regulate and absolutely control the navigation of the Monongahela River was supreme and paramount; that it was not within the power of the State to grant to any corporation or persons a franchise in, or connected with, the navigation of said river which was not wholly subordinate to the rights of the United States; that any franchise granted by the State had, as matter of law, necessarily within it, as a condition, that it might be terminated at any time by an act of the United States, and that therefore no injury entitled to compensation could accrue to any party claiming such franchise, by reason of the exercise of such paramount right by the United States.

I.   Has the appellant, as against the United States, a vested property in the franchise to maintain and take toll for the use of this lock and dam ?   By clause 3, section 8, article 1, of the Constitution, there is vested in Congress power "to regulate commerce with foreign nations, and among the several States, and with the Indian tribes."   Under this grant

the authority of Congress to control the navigation of all streams which are highways of commerce between the States has been uniformly asserted by Congress and never success fully denied in the courts. It is true there are numerous decisions upholding the exercise of a regulating power over such channels of commerce by the States, but in every case it has been admitted that such exercise could be upheld only because and so long as Congress failed to assert its jurisdiction.

It is presumed that it will not be questioned by appellants that the Monongahela River, at the point under discussion, was a navigable channel of interstate commerce. Certainly such a contention could not be successfully maintained. *Escanaba Company* v. *Chicago*, 107 U. S. 678; *Barney* v. *Keokuk*, 94 U. S. 324; *The Montello*, 20 Wall. 430; *The Genesee Chief*, 12 How. 443; *Bridge Co.* v. *United States*, 105 U. S. 470; *Gilman* v. *Philadelphia*, 3 Wall. 713; *Willamette Bridge Co.* v. *Hatch*, 125 U. S. 1.

In *Bridge Co.* v. *United States*, Chief Justice Waite, delivering the opinion of the court, said (at page 479): "the power of Congress in respect to legislation for the preservation of interstate commerce is just as free from State interference as any other subject within the sphere of its legislative authority. The action of Congress is supreme, and overrides all that the States can do. Where, therefore, Congress in a proper way declares a bridge across a navigable river of the United States to be an unlawful structure, no legislation of a State can make it lawful. Those who act on state authority alone necessarily assume all the risks of legitimate Congressional interference." This case is instructive, not only in the clearness of the opinion of the Chief Justice, speaking for the majority of the court, but because the dissenting opinions bring out with more distinctness the points decided.

In *The Willamette Bridge Case*, the late Mr. Justice Bradley, in the opinion of the court, said (p. 12): "We do not doubt that Congress, if it saw fit, could thus assume the care of said streams, in the interest of foreign and interstate commerce; we only say that, in our opinion, it has not done so by the clause in question. And although, until Congress acts, the

States have the plenary power supposed, yet, when Congress chooses to act, it is not concluded by anything that the States, or individuals by its authority or acquiescence, have done, from assuming entire control of the matter, and abating any erections that may have been made, and preventing any others from being made, except in conformity with such regulations as it may impose. It is for this reason, viz., the ultimate (though yet unexerted) power of Congress over the whole subject matter, that the consent of Congress is so frequently asked to the erection of bridges over navigable streams. It might itself give original authority for the erection of such bridges when called for by the demands of interstate commerce by land; but in many, perhaps the majority, of cases, its assent only is asked, and the primary authority is sought at the hands of the State." *The Willamette Bridge* and *The Escanaba Bridge* cases above cited. See also *Gilman* v. *Philadelphia*, 3 Wall. 713; *Martin* v. *Mott*, 12 Wheat. 19; *Luther* v. *Borden*, 7 How. 1, 43.

III. The foregoing propositions being established, the maintenance of appellant's contention that it has in this franchise a vested property as against the United States is impossible. The truth is that in condemning and paying the appellant for its material improvements Congress makes a concession which could not have been enforced by law. It was entirely competent for Congress to have enacted and enforced a law forbidding the collection of any further tolls by this corporation, as being an unlawful obstruction or interference with interstate commerce, making in said law no provision whatever for any payment to the owners of the property. It has not, however, seen fit to enforce the extreme legal rights of the Government, but recognizing the large expenditures of money made by this company, and the equity growing out of such expenditures, provision has been made for the reimbursement of all such expenditures. *Veazie Bank* v. *Fenno*, 8 Wall. 533, 547.

IV. But not only is the demand for compensation on account of the destruction of this franchise unfounded as against the United States, but such a demand could not be maintained even against the State of Pennsylvania. In the legis-

lation constituting the charter of appellant, through which alone it obtains any rights in the premises, the State distinctly reserved the option to take possession of this property upon the payment of the cost of material improvements, and expenses, with six per cent interest, less dividends.

In view of these enactments, it is clear that this corporation has no contract with the State of Pennsylvania for an unlimited franchise. Its property is always subject to be taken by the State as provided in the sections quoted. Much less can appellant demand compensation for the franchise from the government of the United States, with which it has no contract in the premises, and which is simply exercising a paramount authority derived directly from the Constitution of the United States, the supreme law of the land.

V. It is said that by the act of March 3, 1881, (21 Stat. 471,) Congress has impliedly recognized and confirmed a vested right in the premises.

To this proposition there are two very ready answers. *First:* the legislation of 1881 does not by its terms amount to a contract between the government and appellant in the premises. *The Bridge Company* v. *The United States,* 105 U. S. 570. *Second:* it is incompetent for a legislature to barter away or conclude itself in the exercise of any constitutional grant of legislative power. The legislature of Pennsylvania, itself, has held that the right of the Navigation Company in the case at bar is a revocable license. *Monongahela Navigation Co.* v. *Coons,* 6 W. & S. 101; *Susquehanna Canal Co.* v. *Wright,* 9 W. & S. 9; *S. C.* 42 Am. Dec. 312; *New York & Erie Railroad* v. *Young,* 33 Penn. St. 175; *McKeen* v. *Delaware Canal Co.,* 49 Penn. St. 424; *Freeland* v. *Pennsylvania Railroad,* 66 Penn. St. 91. See also *Bailey* v. *Phil. Wilm. & Balt. Railroad,* 4 Harr. (Del.) 389; *S. C.* 44 Am. Dec. 593; *Rundle* v. *Del. & Raritan Canal Co.,* 14 How. 80.

In conclusion, we submit that the power of Congress over this subject matter is plenary. *In re Rapier,* 143 U. S. 110, 134.

*Mr. C. Newell* and *Mr. D. T. Watson* also filed a brief for appellee.

MR. JUSTICE BREWER, after stating the case, delivered the opinion of the court.

It appears from the foregoing statement that the Monongahela Company had, under express authority from the State of Pennsylvania, expended large sums of money in improving the Monongahela River, by means of locks and dams; and that the particular lock and dam in controversy were built not only by virtue of this authority from the State of Pennsylvania, but also at the instance and suggestion of the United States. By means of these improvements, the Monongahela River, which theretofore was only navigable for boats of small tonnage, and at certain seasons of the year, now carries large steamboats at all seasons, and an extensive commerce by means thereof. The question presented is not whether the United States has the power to condemn and appropriate this property of the Monongahela Company, for that is conceded, but how much it must pay as compensation therefor. Obviously, this question, as all others which run along the line of the extent of the protection the individual has under the Constitution against the demands of the government, is of importance; for in any society the fulness and sufficiency of the securities which surround the individual in the use and enjoyment of his property constitute one of the most certain tests of the character and value of the government. The first ten amendments to the Constitution, adopted as they were soon after the adoption of the Constitution, are in the nature of a bill of rights, and were adopted in order to quiet the apprehension of many, that without some such declaration of rights the government would assume, and might be held to possess, the power to trespass upon those rights of persons and property which by the Declaration of Independence were affirmed to be unalienable rights.

In the case of *Sinnickson* v. *Johnson*, 17 N. J. L. (2 Harr.) 129, 145, cited in the case of *Pumpelly* v. *Green Bay Company*, 13 Wall. 166, 178, it was said that " this power to take private property reaches back of all constitutional provisions; and it seems to have been considered a settled principle of uni-

versal law that the right to compensation is an incident to the exercise of that power; that the one is so inseparably connected with the other, that they may be said to exist not as separate and distinct principles, but as parts of one and the same principle." And in *Gardner* v. *Newburgh*, 2 Johns. Ch. 162, Chancellor Kent affirmed substantially the same doctrine. And in this there is a natural equity which commends it to every one. It in no wise detracts from the power of the public to take whatever may be necessary for its uses; while, on the other hand, it prevents the public from loading upon one individual more than his just share of the burdens of government, and says that when he surrenders to the public something more and different from that which is exacted from other members of the public, a full and just equivalent shall be returned to him.

But we need not have recourse to this natural equity, nor is it necessary to look through the Constitution to the affirmations lying behind it in the Declaration of Independence, for, in this Fifth Amendment, there is stated the exact limitation on the power of the government to take private property for public uses. And with respect to constitutional provisions of this nature, it was well said by Mr. Justice Bradley, speaking for the court, in *Boyd* v. *The United States*, 116 U. S. 616, 635: "Illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. This can only be obviated by adhering to the rule that constitutional provisions for the security of person and property should be liberally construed. A close and literal construction deprives them of half their efficacy, and leads to gradual depreciation of the right, as if it consisted more in sound than in substance. It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon. Their motto should be *obsta principiis*."

The language used in the Fifth Amendment in respect to this matter is happily chosen. The entire amendment is a series of negations, denials of right or power in the government, the last, the one in point here, being, "Nor shall private

property be taken for public use without just compensation." The noun "compensation," standing by itself, carries the idea of an equivalent. Thus we speak of damages by way of compensation, or compensatory damages, as distinguished from punitive or exemplary damages, the former being the equivalent for the injury done, and the latter imposed by way of punishment. So that if the adjective "just" had been omitted, and the provision was simply that property should not be taken without compensation, the natural import of the language would be that the compensation should be the equivalent of the property. And this is made emphatic by the adjective "just." There can, in view of the combination of those two words, be no doubt that the compensation must be a full and perfect equivalent for the property taken. And this just compensation, it will be noticed, is for the property, and not to the owner. Every other clause in this Fifth Amendment is personal. "No person shall be held to answer for a capital, or otherwise infamous crime," etc. Instead of continuing that form of statement, and saying that no person shall be deprived of his property without just compensation, the personal element is left out, and the "just compensation" is to be a full equivalent for the property taken. This excludes the taking into account, as an element in the compensation, any supposed benefit that the owner may receive in common with all from the public uses to which his private property is appropriated, and leaves it to stand as a declaration, that no private property shall be appropriated to public uses unless a full and exact equivalent for it be returned to the owner.

We do not in this refer to the case where only a portion of a tract is taken, or express any opinion on the vexed question as to the extent to which the benefits or injuries to the portion not taken may be brought into consideration. This is a question which may arise possibly in this case, if the seven locks and dams belonging to the Navigation Company are so situated as to be fairly considered one property, a matter in respect to which the record before us furnishes no positive evidence. It seems to be assumed that each lock and dam by itself constitutes a separate structure and separate property,

and the thoughts we have suggested are pertinent to such a case.

By this legislation, Congress seems to have assumed the right to determine what shall be the measure of compensation. But this is a judicial and not a legislative question. The legislature may determine what private property is needed for public purposes — that is a question of a political and legislative character; but when the taking has been ordered, then the question of compensation is judicial. It does not rest with the public, taking the property, through Congress or the legislature, its representative, to say what compensation shall be paid, or even what shall be the rule of compensation. The Constitution has declared that just compensation shall be paid, and the ascertainment of that is a judicial inquiry. In *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420, 571, Mr. Justice McLean in his opinion, referring to a provision for compensation found in the charter of the Warren bridge, uses this language: "They [the legislature] provide that the new company shall pay annually to the college, in behalf of the old one, one hundred pounds. By this provision, it appears that the legislature has undertaken to do what a jury of the country only could constitutionally do: assess the amount of compensation to which the complainants are entitled." See also the following authorities: *Commonwealth* v. *Pittsburgh & Connellsville Railroad*, 58 Penn. St. 26, 50; *Penn. Railroad* v. *Balt. & Ohio Railroad*, 60 Maryland, 263; *Isom* v. *Mississippi Central Railroad*, 36 Mississippi, 300.

In the last of these cases, and on page 315, will be found these observations of the court: "The right of the legislature of the State, by law, to apply the property of the citizen to the public use, and then to constitute itself the judge in its own case, to determine what is the 'just compensation' it ought to pay therefor, or how much benefit it has conferred upon the citizen by thus taking his property without his consent, or to extinguish any part of such 'compensation' by prospective conjectural advantage, or *in any manner* to interfere with the just powers and province of courts and juries in administering right and justice, cannot for a moment be admitted

or tolerated under our Constitution. If anything *can be* clear and undeniable, upon principles of natural justice or constitutional law, it seems that this must be so."

We are not, therefore, concluded by the declaration in the act that the franchise to collect tolls is not to be considered in estimating the sum to be paid for the property.

How shall just compensation for this lock and dam be determined? What does the full equivalent therefor demand? The value of property, generally speaking, is determined by its productiveness — the profits which its use brings to the owner. Various elements enter into this matter of value. Among them we may notice these: Natural richness of the soil as between two neighboring tracts — one may be fertile, the other barren; the one so situated as to be susceptible of easy use, the other requiring much labor and large expense to make its fertility available. Neighborhood to the centres of business and population largely affects values. For that property which is near the centre of a large city may command high rent, while property of the same character, remote therefrom, is wanted by but few, and commands but a small rental. Demand for the use is another factor. The commerce on the Monongahela River, as appears from the testimony offered, is great; the demand for the use of this lock and dam constant. A precisely similar property, in a stream where commerce is light, would naturally be of less value, for the demand for the use would be less. The value, therefore, is not determined by the mere cost of construction, but more by what the completed structure brings in the way of earnings to its owner. For each separate use of one's property by others, the owner is entitled to a reasonable compensation; and the number and amount of such uses determine the productiveness and the earnings of the property, and, therefore, largely its value. So that if this property, belonging to the Monongahela Company, is rightfully where it is, the company may justly demand from every one making use of it a compensation; and to take that property from it deprives it of the aggregate amount of such compensation which otherwise it would continue to receive. What amount of compensation for

each separate use of any particular property may be charged is sometimes fixed by the statute which gives authority for the creation of the property; sometimes determined by what it is reasonably worth ; and sometimes, if it is purely private property, devoted only to private uses, the matter rests arbitrarily with the will of the owner. In this case, it being property devoted to a public use, the amount of compensation was subject to the determination of the State of Pennsylvania, the State which authorized the creation of the property. The prices which may be exacted under this legislative grant of authority are the tolls, and these tolls, in the nature of the case, must enter into and largely determine the matter of value. In the case of *Montgomery County* v. *Bridge Company*, 110 Penn. St. 54, 58, in which the condemnation of a bridge belonging to the bridge company was sought, the court said: "The bridge structure, the stone, iron and wood, was but a portion of the property owned by the bridge company, and taken by the county. There were the franchises of the company, including the right to take toll, and these were as effectually taken as was the bridge itself. Hence, to measure the damages by the mere cost of building the bridge would be to deprive the company of any compensation for the destruction of its franchises. The latter can no more be taken without compensation than can its tangible corporeal property. Their value necessarily depends upon their productiveness. If they yield no money in return over expenditures, they would possess little, if any, present value. If, however, they yield a revenue over and above expenses, they possess a present value, the amount of which depends, in a measure, upon the excess of revenue. Hence it is manifest that the income from the bridge was a necessary and proper subject of inquiry before the jury."

So, before this property can be taken away from its owners, the whole value must be paid ; and that value depends largely upon the productiveness of the property, the franchise to take tolls. That, in the absence of Congressional action, the State of Pennsylvania had the power, either acting itself or through a corporation which it chartered, to improve the navigation of the river by means of locks and dams, and also to authorize

the exaction of tolls for the use of such improvements, are matters upon which there can be no dispute, in view of the many decisions of this court. Those very closely in point are *Willson* v. *Blackbird Creek Marsh Co.*, 2 Pet. 245 ; *Pound* v. *Turck*, 95 U. S. 459 ; *Huse* v. *Glover*, 119 U. S. 543 ; *Sands* v. *Manistee River Improvement Co.*, 123 U. S. 288.

In the first of these cases it appeared that the Marsh Company was incorporated by an act of the general assembly of Delaware, and authorized to construct a dam across Blackbird Creek, a navigable stream within the territorial limits of the State ; that, in pursuance of such authority, it did construct such dam, by which the navigation of the stream was obstructed ; Willson, with others, were the owners of a sloop, regularly licensed according to the laws of the United States, which sloop broke and injured the dam. On being sued for this injury, the owners pleaded that the dam was wrongfully erected, obstructing the navigation of the stream, and that the sloop could not, without breaking through the dam, pass over and along the stream, and that in order to remove the said obstructions it did the injury complained of. A demurrer to this plea was sustained, and in due course the case came to this court. The opinion was delivered by Chief Justice Marshall, sustaining the ruling, and holding that the dam, in the absence of legislation by Congress, was rightfully there, having been authorized by the legislature of the State in which the stream was situated. In it the Chief Justice said (p. 252): "If Congress had passed any act which bore upon the case, any act in execution of the power to regulate commerce, the object of which was to control state legislation over those small navigable creeks into which the tide flows, and which abound throughout the lower country of the middle and southern States, we should feel not much difficulty in saying that a state law coming in conflict with such act would be void. But Congress has passed no such act. The repugnancy of the law of Delaware to the Constitution is placed entirely on its repugnancy to the power to regulate commerce with foreign nations and among the several States ; a power which has not been so exercised as to affect the question. We do

not think that the act empowering the Blackbird Creek Marsh Company to place a dam across the creek, can, under all the circumstances of the case, be considered as repugnant to the power to regulate commerce in its dormant state, or as being in conflict with any law passed on the subject."

In the case of *Pound* v. *Turck*, it appeared that a dam and boom had been placed in the Chippewa River, under authority of the legislature of Wisconsin. The fact that the plaintiff suffered injury therefrom was established, and the defence was that they were rightfully there. Mr. Justice Miller, speaking for the court, on page 464, uses this language : " There are within the State of Wisconsin, and perhaps other States, many small streams navigable for a short distance from their mouths in one of the great rivers of the country, by steamboats, but whose greatest value in water carriage is as outlets to saw-logs, sawed lumber, coal, salt, etc. In order to develop their greatest utility in that regard, it is often essential that such structures as dams, booms, piers, etc., should be used, which are substantial obstructions to general navigation, and more or less so to rafts and barges. But to the legislature of the State may be most appropriately confided the authority to authorize these structures where their use will do more good than harm, and to impose such regulations and limitations in their construction and use as will best reconcile and accommodate the interest of all concerned in the matter. And since the doctrine we have deduced from the cases recognizes the right of Congress to interfere and control the matter whenever it may deem it necessary to do so, the exercise of this limited power may all the more safely be confided to the local legislature."

*Huse* v. *Glover* comes even nearer to this case. The State of Illinois, at an expense of several hundred thousand dollars, constructed locks and dams on the Illinois River for the purpose of improving its navigation, and prescribed rates of toll to be paid by those using the improvements. A bill was filed to enjoin the exaction of toll on vessels of complainant passing through the improved waters of the river. - After referring to the clause in the ordinance for the government of the North-west Territory, which provided that the navigable waters

should be common highways; forever free, without any tax or duty, Mr. Justice Field, for the court, on page 548, said: "The exaction of tolls for passage through the locks is as compensation for the use of artificial facilities constructed, not as an impost upon the navigation of the stream. The provision of the clause that the navigable streams should be highways without any tax, impost or duty, has reference to their navigation in their natural state. It did not contemplate that such navigation might not be improved by artificial means, by the removal of obstructions, or by the making of dams for deepening the waters, or by as rning into the rivers waters from other streams to increase their depth. For outlays caused by such works the State may exact reasonable tolls. They are like charges for the use of wharves and docks constructed to facilitate the landing of persons and freight, and the taking them on board, or for the repair of vessels. The State is interested in the domestic as well as in the in erstate and foreign commerce conducted on the Illinois River, and to increase its facilities, and thus augment its growth, it has full power. It is only when, in the judgment of Congress, its action is deemed to encroach upon the navigation of the river as a means of interstate and foreign commerce, that that body may interfere and control or supersede it. If, in the opinion of the State, greater benefit would result to her commerce by the improvements made, than by leaving the river in its natural state, — and on that point the State must necessarily determine for itself, — it may authorize them, although increased inconvenience and expense may thereby result to the business of individuals. . . . How the highways of a State, whether on land or by water, shall be best improved for the public good is a matter for state determination, subject always to the right of Congress to interpose in the cases mentioned."

And in the last of these cases, where the Manistee River was improved under authority of the legislature of the State of Michigan, and tolls exacted for the use of the improved water way, we find this in the opinion, on page 295: "The internal commerce of the State — that is, the commerce which is wholly confined within its limits — is as much under its con-

trol as foreign or interstate commerce is under the control of the general government; and, to encourage the growth of this commerce and render it safe, the States may provide for the removal of obstructions from their rivers and harbors, and deepen their channels, and improve them in other ways, if, as is said in *County of Mobile* v. *Kimball*, the free navigation of those waters, as permitted under the laws of the United States, is not impaired, or any system for the improvement of their navigation provided by the general government is not defeated. 102 U. S. 691, 699. And to meet the cost of such improvements, the States may levy a general tax or lay a toll upon all who use the rivers and harbors as improved. The improvements are, in that respect, like wharves and docks constructed to facilitate commerce in loading and unloading vessels. *Huse* v. *Glover*, 119 U. S. 543, 548. Regulations of tolls or charges in such cases are mere matters of administration, under the entire control of the State."

Kindred to these are the cases of *Gilman* v. *Philadelphia*, 3 Wall. 713; *Transportation Company* v. *Chicago*, 99 U. S. 635; *Escanaba Company* v. *Chicago*, 107 U. S. 678; *Cardwell* v. *American Bridge Co.*, 113 U. S. 205 ; and *Willamette Bridge Company* v. *Hatch*, 125 U. S. 1, 12, in which the power of a State, in the absence of Congressional action, to obstruct navigation by the construction of bridges across navigable streams, was sustained. And, also, the cases of *Packet Co.* v. *Keokuk*, 95 U. S. 80, and *Transportation Co.* v. *Parkersburg*, 107 U. S. 691, in which the power of a State, under like circumstances to improve the border of streams by wharves and exact wharfage therefor, was affirmed.

While in a matter of this kind it is needless to look for authorities beyond the decisions of this court, yet the cases of *Kellogg* v. *Union Company*, 12 Connecticut, 6, and *Thames Bank* v. *Lovell*, 18 Connecticut, 500, may be referred to as containing very satisfactory discussions of this question. We quote from the opinion in the latter case, page 511 :

"These acts, improving rivers, constructing roads, etc., will never be complained of, as interfering with the rights and powers of Congress. The tolls alone are the subject of com-

plaint. But these are only the fair equivalent for privileges which the State had a right to create, and without which these privileges could never have existed. Commerce, therefore, has not been crippled by the tolls, as the defendant claims, but has been extended by them. The legislature of the State creating this corporation, with its duties and its privileges, has come in aid of the powers of Congress.

"It seems to be admitted, that States may construct canals, turnpikes, bridges, etc., and impose tolls upon passengers and freight, as a remuneration for the improvements; and that this may be done, without interfering with the power of Congress to regulate commerce among the States, or its power to establish post-offices and post-roads. We have not been able to discover a sound distinction between these cases and the one we are considering. Congress has the same power to regulate commerce upon the land as upon the water. A river, to be sure, is a natural channel; but if it is not a navigable one, it can no more be used for the purposes of commerce than the land; and, therefore, to convert it from the mere natural channel into a public highway, for commercial purposes, and to levy a toll to reimburse the expense, no more conflicts with the powers of Congress over the commerce of the country than the construction of a canal or a turnpike for the same purposes, with the same tolls. And this, we think, is equally true of rivers, which are only navigable to a partial and limited extent, and by artificial and expensive means are rendered navigable to a greater extent, with a reasonable toll levied upon those only who receive the benefit of the extended navigation. The principle is the same in both the cases stated."

But in this case there was not only the full authority of the State of Pennsylvania, but also, so far as respects this particular lock and dam, they were constructed at the instance and implied invitation of Congress. The act of March 3, 1881, making an appropriation for the improvement of the river, in terms provided that no such improvement should be made until the Navigation Company had in good faith started upon the building of this lock and dam. This lock and dam connected the lower improvements already made by the Naviga-

tion Company with the upper improvements proposed to be made by Congress, and the appropriation by the latter was conditioned on the company's undertaking their construction. This is something more than the mere recognition of an existing fact; it is an invitation to the company to do the work; and when in pursuance of that invitation, and under authority given by the State of Pennsylvania, the company has constructed the lock and dam, it does not lie in the power of the State or the United States to say that such lock and dam are an obstruction and wrongfully there, or that the right to compensation for the use of this improvement by the public does not belong to its owner, the Navigation Company.

Upon what does the right of Congress to interfere in the matter rest? Simply upon the power to regulate commerce. This is one of the great powers of the national government, one whose existence and far-reaching extent have been affirmed again and again by this court in its leading opinions, and the power of Congress over such natural highways as navigable streams is confessedly supreme. See among the various cases in which this supremacy has been affirmed: *Gilman* v. *Philadelphia*, 3 Wall. 713, 725; *County of Mobile* v. *Kimball*, 102 U. S. 691, 696; *Bridge Company* v. *United States*, 105 U. S. 470, 482; *Miller* v. *New York*, 109 U. S. 385, 392; *Wisconsin* v. *Duluth*, 96 U. S. 379; *Willamette Iron Bridge Company* v. *Hatch*, 125 U. S. 1. In *Wisconsin* v. *Duluth* (p. 383) it was said: "It is to be observed, as preliminary to an examination of the acts of the general government in the special matter before us, that the whole system of river and lake and harbor improvements, whether on the seacoast or on the lakes or the great navigable rivers of the interior, has for years been mainly under the control of that government, and that, whenever it has taken charge of the matter, its right to an exclusive control has not been denied. . . . And while this court has maintained, in many cases, the right of the States to authorize structures in and over the navigable waters of the States, which may either impede or improve their navigation, in the absence of any action of the general government in the same matter, the doctrine has been laid down with unvarying

uniformity, that when Congress has, by any expression of its will, occupied the field, that action was conclusive of any right to the contrary asserted under state authority. The adjudged cases in this court on this point are numerous."

And in *Willamette Iron Bridge Company* v. *Hatch* (p. 12) the proposition was thus stated: "And although, until Congress acts, the States have the plenary power supposed, yet, when Congress chooses to act, it is not concluded by anything that the States, or that individuals by its authority or acquiescence, have done, from assuming entire control of the matter, and abating any erections that may have been made, and preventing any others from being made, except in conformity with such regulations as it may impose." It cannot be doubted, in view of the long list of authorities, — for many more might be cited, — that Congress has the power in its discretion to compel the removal of this lock and dam as obstructions to the navigation of the river, or to condemn and take them for the purpose of promoting its navigability. In other words, it is within the competency of Congress to make such provision respecting the improvement of the Monongahela River as in its judgment the public interests demand. Its dominion is supreme.

But like the other powers granted to Congress by the Constitution, the power to regulate commerce is subject to all the limitations imposed by such instrument, and among them is that of the Fifth Amendment, we have heretofore quoted. Congress has supreme control over the regulation of commerce, but if, in exercising that supreme control, it deems it necessary to take private property, then it must proceed subject to the limitations imposed by this Fifth Amendment, and can take only on payment of just compensation. The power to regulate commerce is not given in any broader terms than that to establish post-offices and post-roads; but, if Congress wishes to take private property upon which to build a post-office, it must either agree upon the price with the owner, or in condemnation pay just compensation therefor. And if that property be improved under authority of a charter granted by the State, with a franchise to take tolls for the use of the

improvement, in order to determine the just compensation, such franchise must be taken into account. Because Congress has power to take the property, it does not follow that it may destroy the franchise without compensation. Whatever be the true value of that which it takes from the individual owner must be paid to him, before it can be said that just compensation for the property has been made. And that which is true in respect to a condemnation of property for a post-office is equally true when condemnation is sought for the purpose of improving a natural highway. Suppose, in the improvement of a navigable stream, it was deemed essential to construct a canal with locks, in order to pass around rapids or falls. Of the power of Congress to condemn whatever land may be necessary for such canal, there can be no question; and of the equal necessity of paying full compensation for all private property taken there can be as little doubt. If a man's house must be taken, that must be paid for; and, if the property is held and improved under a franchise from the State, with power to take tolls, that franchise must be paid for, because it is a substantial element in the value of the property taken. So, coming to the case before us, while the power of Congress to take this property is unquestionable, yet the power to take is subject to the constitutional limitation of just compensation. It should be noticed that here there is unquestionably a taking of the property, and not a mere destruction. It is not a case in which the government requires the removal of an obstruction. What differences would exist between the two cases, if any, it is unnecessary here to inquire. All that we need consider is the measure of compensation when the government, in the exercise of its sovereign power, takes the property.

And here it may be noticed that, after taking this property, the government will have the right to exact the same tolls the Navigation Company has been receiving. It would seem strange that if by asserting its right to take the property, the government could strip it largely of its value, destroying all that value which comes from the receipt of tolls, and, having taken the property at this reduced valuation, immediately possess and enjoy all the profits from the collection of the same tolls.

In other words, by the contention this element of value exists before and after the taking, and disappears only during the very moment and process of taking. Surely, reasoning which leads to such a result must have some vice, at least the vice of injustice.

Much reliance is placed upon the case of *Bridge Company* v. *United States*, 105 U. S. 470. But that was a case not of the taking, but of the destruction, of property. It is true, Mr. Chief Justice Waite, in delivering the opinion of the court, uses this language in reference to the power of Congress: " But the power of Congress in respect to legislation for the preservation of interstate commerce is just as free from state interference as any other subject within the sphere of its legislative authority. The action of Congress is supreme and overrides all that States may do. When, therefore, Congress, in a proper way, declares a bridge across a navigable river of the United States to be an unlawful structure, no legislation of a State can make it lawful. Those who act on state authority alone, necessarily assume all the risks of legitimate congressional interference." But such affirmation of power was not made with reference to a question like this. The facts in that case were these: The Bridge Company was a creature of the legislation of the States of Ohio and Kentucky, and incorporated to build a bridge across the Ohio River, between Newport and Cincinnati. The state charters authorized the construction of a bridge in accordance with the provisions of an act of Congress of July 14, 1862, or any act that Congress might pass on the subject. On March 3, 1869, Congress passed a resolution giving its assent to the construction of this bridge. This resolution contained this reservation: " But Congress reserves the right to withdraw the assent hereby given, in case the free navigation of said river shall at any time be substantially and materially obstructed by any bridge to be erected under the authority of this resolution, or to direct the necessary modifications and alterations of said bridge." 15 Stat. 347. After the passage of this resolution the company commenced the erection of a drawbridge, and expended a large amount of money in the undertaking.

Before, however, the bridge was finished, Congress passed an act (the act of March 3, 1871, 16 Stat. 572, 573, c. 121) requiring a high bridge. The act provided that upon the Bridge Company making the changes required by the act, it might file its bill in the Circuit Court of the United States for the Southern District of Ohio, to have determined whether the bridge had been constructed theretofore, so far as the work had progressed, in accordance with the provisions of law then in existence; and, second, the liability of the United States, if any there was, by reason of the changes. The suit was brought, and on appeal to this court, by four to three, Mr. Justice Matthews taking no part in the decision, the court held that the government was not liable for any damages. The case turned in the judgment of the majority mainly upon the resolution of March 3, 1869, heretofore quoted. In the early part of the opinion, (p. 475,) the Chief Justice says: "No question can arise in this case upon what the States have done, for both Ohio and Kentucky required the company to comply with the regulations of Congress. Neither are we called on to determine what would have been the rights of the company, if, in the original license, no power of future control by Congress had been reserved." He then proceeds to consider at some length the peculiar language of that reservation. Under it, as he says, Congress had the right to withdraw assent, which was equivalent to a positive enactment that a further maintenance of the bridge, as at first planned and partially constructed, was unlawful, and the mere exercise of its power under this reservation, to declare the proposed structure unlawful, did not expose the government to any liability for damages. We quote fully the expression of views on this subject:

"It is next insisted that if, in the judgment of Congress, the public good required the bridge to be removed, or alterations to be made in its structure, just compensation must be made the company for the loss incurred by what was directed. It is true that one cannot be deprived of his property without due process of law, and that private property cannot be taken for public use without just compensation.

"In the present case, the Bridge Company asked of Con-

gress permission to erect its bridge. In response to this request permission was given, but only on condition that it might be revoked at any time if the bridge was found to be detrimental to navigation. This condition was an essential element of the grant, and the company in accepting the privileges conferred by the grant assumed all risks of loss arising from any exercise of the power which Congress saw fit to reserve. What the company got from Congress was the grant of a franchise expressly made defeasible at will, to maintain a bridge across one of the great highways of commerce. This franchise was a species of property, but from the moment of its origin its continued existence was dependent on the will of Congress, and this was declared in express terms on the face of the grant by which it was created. In the use of the franchise thus granted, the company might, and it was expected would, acquire property. The property thus acquired Congress could not appropriate to itself by a withdrawal of its assent to the maintenance of the bridge that was to be built, but the franchise, by express agreement, was revocable whenever in the judgment of Congress it could not be used without substantial and material detriment to the interest of navigation. A withdrawal of the franchise might render property acquired on the faith of it, and to be used in connection with it, less valuable; but that was a risk which the company voluntarily assumed when it expended its money under the limited license which alone Congress was willing to give. It was optional with the company to accept or not what was granted, but having accepted, it must submit to the control which Congress, in the legitimate exercise of the power that was reserved, may deem it necessary for the common good to insist upon."

It is evident, therefore, that the point decided was that Congress had reserved the right to withdraw its assent to the construction of a bridge on the plan proposed, whenever, in its judgment, such bridge should become an obstruction to the navigation; that the Bridge Company entered upon the construction of the bridge in the light of this express reservation, and with the knowledge that Congress might at any time declare that the bridge constructed as proposed was an

obstruction to navigation; and that Congress, exercising this reserved power, did not thereby subject the government to any liability for damages. There was no taking of private property for public uses; and while the company may have been deprived of property, it was deprived by due process of law, because deprived under authority of an express reservation of power. Even this conclusion was reached with strong dissent, Mr. Justice Miller, Mr. Justice Field and Mr. Justice Bradley dissenting, and each writing a separate opinion. And those opinions only make more clear the fact that the case was rested in the judgment of the majority on the effect of the reservation.

In the case at bar there is no such reservation; there is no attempt to destroy property; there is simply a case of the taking by the government, for public uses, of the private property of the Navigation Company. Such an appropriation cannot be had without just compensation; and that, as we have seen, demands payment of the value of the property as it stands at the time of taking.

The theory of the government seems to be, that the right of the Navigation Company to have its property in the river, and the franchises given by the State to take tolls for the use thereof, are conditional only, and that whenever the government, in the exercise of its supreme power, assumes control of the river, it destroys both the right of the company to have its property there, and the franchise to take tolls. But this is a misconception. The franchise is a vested right. The State has power to grant it. It may retake it, as it may take other private property, for public uses, upon the payment of just compensation. A like, though a superior, power exists in the national government. It may take it for public purposes, and take it even against the will of the State; but it can no more take the franchise which the State has given than it can any private property belonging to an individual.

Notice to what the opposite view would lead: A railroad between Columbus, Ohio, and Harrisburg, Pennsylvania, is an interstate highway, created under franchises granted by the two States of Ohio and Pennsylvania, franchises not

merely to construct, but to take tolls for the carrying of passengers and freight. In its exercise of supreme power to regulate commerce, Congress may condemn and take that interstate highway; but in the exercise of that power, and in the taking of such property, may it ignore the franchises to take tolls, granted by the States, or must it not rather pay for them, as it pays for the rails, the bridges, and the tracks? The question seems to carry its own answer. It may be suggested that the cases are not parallel, in that in the present there is a natural highway; while in that suggested it is wholly artificial. But the power of Congress is not determined by the character of the highway. Nowhere in the Constitution is there given power in terms over highways, unless it be in that clause to establish post-offices and post-roads. The power which Congress possesses in respect to this taking of property springs from the grant of power to regulate commerce; and the regulation of commerce implies as much control, as far-reaching power, over an artificial as over a natural highway. They are simply the means and instrumentalities of commerce, and the power of Congress to regulate commerce carries with it power over all the means and instrumentalities by which commerce is carried on. There may be differences in the modes and manner of using these different highways, but such differences do not affect or limit that supreme power of Congress to regulate commerce, and in such regulation to control its means and instrumentalities. We are so much accustomed to see artificial highways, such as common roads, turnpike roads and railroads, constructed under the authority of the States, and the improvement of natural highways carried on by the general government, that at the first it might seem that there was some inherent difference in the power of the national government over them. But the grant of power is the same. There are not two clauses of the Constitution, each severally applicable to a different kind of highway. The fee of the soil in neither case is in the general government, but in the State or private individuals. The differences between the two are in their origin — nature provides the one, man establishes the other.

Mr. Justice Bradley, delivering the opinion of the court in. *Railroad Company* v. *Maryland*, 21 Wall. 456, 470, referred to this matter in these words: "Commerce on land between the different States is so strikingly dissimilar, in many respects, from commerce on water, that it is often difficult to regard them in the same aspect in reference to the respective con-- stitutional powers and duties of the State and Federal govern- ments. No doubt commerce by water was principally in the minds of those who framed and adopted the Constitution, although both its language and spirit embrace commerce. by land as well."

It is also suggested that the government does not take this franchise; that it does not need any authority from the State for the exaction of tolls, if it desires to exact them; that it only appropriates the tangible property, and then either makes the use of it free to all, or exacts such tolls as it sees fit, or transfers the property to a new corporation of its own crea- tion, with such a franchise to take tolls as it chooses to give. But this franchise goes with the property; and the Navigation Company, which owned it, is deprived of it. The government takes it away from the company, whatever use it may make of it; and the question of just compensation is not determined by the value to the government which takes, but the value to the individual from whom the property is taken; and when by the taking of the tangible property the owner is actually deprived of the franchise to collect tolls, just compensation requires payment, not merely of the value of the tangible property itself, but also of that of the franchise of which he is deprived.

Another contention is this: First, that the grant of right to the Navigation Company was a mere revocable license; secondly, that, if it was not, there was a right in the State to alter, amend or annul the charter; and, thirdly, that there was, by the 18th section thereof, reserved the right at any time after twenty-five years from the completion of the improve- ment to purchase the entire improvement. and franchise by paying the original cost, together with six per cent interest thereon, deducting dividends theretofore declared and paid —

a provision changed by section 8 of the act of June 4, 1839, so as to require a payment of the expenses incurred in constructing and making repairs, with eight per cent per annum interest. But little need be said in reference to this line of argument. We do not understand that the Supreme Court of Pennsylvania has ever ruled that a grant like this is a mere revocable license. The cases referred to by counsel are those in which there was simply a permit; but here there was a chartered right created, — the right not merely to improve the river, but to exact tolls for the use of the improvement, — and such right created by an act of incorporation, as long ago settled in this court in *Dartmouth College Trustees* v. *Woodward*, 4 Wheat. 518, is a contract which cannot be set aside by either party to it.

Again, the State has never assumed to exercise any rights reserved in the charter, or by any supplements thereto. So far as the State is concerned, all its grants and franchises remain unchallenged and undisturbed in the possession of the Navigation Company. The State has never transferred, even if it were possible for it to do so, its reserved rights to the United States government, and the latter is proceeding not as the assignee, successor in interest, or otherwise of the State, but by virtue of its own inherent supreme power. What the State might or might not do, is not here a matter of question, though doubtless the existence of this reserved right to take the property upon certain specified terms may often, and perhaps in the present case, materially affect the question of value. And, finally, there is no suggestion on the part of Congress, and no proffer in these proceedings, of payment under the terms of the charter and supplementary act of 1839, and no attempt to ascertain the amount which would be due to the company in accordance therewith.

These are all the questions presented in this case. Our conclusions are, that the Navigation Company rightfully placed this lock and dam in the Monongahela River; that, with the ownership of the tangible property, legally held in that place, it has a franchise to receive tolls for its use; that such franchise was as much a vested right of property as the owner-

ship of the tangible property ; that the right of the national government, under its grant of power to regulate commerce, to condemn and appropriate this lock and dam belonging to the Navigation Company, is subject to the limitations imposed by the Fifth Amendment, that private property shall not be taken for public uses without just compensation; that just compensation requires payment for the franchise to take tolls, as well as for the value of the tangible property ; and that the assertion by Congress of its purpose to take the property does not destroy the state franchise.

The judgment, therefore, will be

*Reversed, and the case remanded with instructions to grant a new trial.*

MR. JUSTICE SHIRAS, having been of counsel, and MR. JUSTICE JACKSON, not having been a member of this court at the time of the argument, took no part in the consideration and decision of this case.