This was an action for actionable negligence brought by plaintiff against the defendant for damages. The facts in substance: R. G. Dudley, who lived near Beaufort, N.C. left his daughter, Effie Waters, wife of plaintiff in a dying condition in a hospital in Petersburg, Va. He left with his dying daughter her mother, Dudley's wife, and their two daughters and plaintiff, her husband. In the contemplation of her death, at Beaufort, N.C. he gave defendant's manager, one E. D. Doyle, $325 to wire plaintiff, and the charge $2.19. This was about ten o'clock on the morning of 14 January, 1926. He had no remembrance as to whether he told Doyle what the money was for. On the 15th, at 4:22 p.m., a wire arrived; it was delivered about the middle of next day to him from plaintiff to send $130. He sent $140. His daughter, plaintiff's wife, died on the morning of 15 January. He and his son-in-law, Ed. Campen, on the morning of 16 January, went to meet the corpse and members of the family on the 11:25 morning train, but the body did not arrive, and they went to the telegraph office and found the telegram asking for $130, and about 1 o'clock he wired $140 to plaintiff. Dudley lived about six and a half miles from Beaufort, beyond the limits where defendant delivers messages except by mail. The mail reaches Dudley's home about quarter to ten in the morning. He got the message an hour and a half after it would have reached him by mail. The body reached home — Beaufort — the morning of the 17th. On the 21st the $300 was paid plaintiff's agent. A boy nineteen years of age working at Petersburg for defendant company admitted he had misread the message, and only paid plaintiff $25.
The plaintiff, Waters, testified in part: "I asked him (R. G. Dudley) about the money, and he said yes, he was coming home and would try to send it. I told him I wanted $350, and when he sent it he sent $325. I told him I expected her to die any minute, and I wanted it to take care of her and ship her home. I don't know the day he left, but it was the night of the 14th that I got the telegram, and I went down to the Western Union office and they delivered me the $25. I asked them if that was all, and they said yes. I told them I was expecting some more, but didn't tell them how much. She died the next morning, the 15th. Q. Tell what you did then? A. I didn't know what to do, and I went to the undertaker, and asked him if he would take care of her, and he said `Nothing doing.' A. After I got $25 I went to the undertaker and asked him would he take care of her." In answer to question by court, the witness said, "I could not get my wife's body without the money." . . . "I then went to the Richmond Trust Company in Hopewell; I got $135 there on my note. I could not borrow any more. I wired my father-in-law *Page 190 
for money, too. I had notified him of my wife's death and he sent me $140. With the $275, in addition to the original $25, I brought her home on the 17th; I don't know exactly, we being delayed two days by the mistake in the telegram. Q. Now, who was up there with you to look after her? A. Her mother and two sisters. Mrs. Clara Dudley, Miss Blanche Dudley, and Mrs. Madera Campen. It cost about $50 caring for them and for myself during the delay for hotel bills and taxi fare." By the court: "Did you pay that? A. Yes, sir. Q. Now what was your physical condition at the time of this? A. I had had a vaccination for smallpox and my arm was in a serious condition. I was having a chill every night and had to carry my arm in a sling. Q. What effect did that trouble you had have on your arm? A. I couldn't get out, for it was raining. It was raining and snowing. Q. How much physical suffering did you have with your arm as a result of this? A. After I came down here and went back it was a week that I couldn't work at all. Q. I am talking about while you were there as a result of it, what effect did it have on you? A. I was having chills during those three days and was in a fever from the vaccination; my arm was swollen and I had to split my sleeve around it. If I could have got the money I could have come on at once and wouldn't have had to go around from place to place to get a note from the bank to get money to bring her down. While I was out trying to get money, my mother in-law stayed with the remains of my wife. She was in the undertaker's shop after she died. I had to go from hotel to hotel, which was about a mile and a half, and it was snowing and bad weather, to get an endorsement on the note. I was sick with my arm and in a fever, and this exposure trying to get the money caused me to have three chills. I never had a chill when my wife died. Q. What effect on your mental condition did those chills have while you were waiting? A. Well, it put me in a bad physical condition and made me sick. Q. Did you have a passenger train leaving Petersburg between eight and nine o'clock in the morning, arriving at eight o'clock that evening? A. Yes, sir; leaving in the morning at 6:35." Most of the evidence was excepted to by defendant, and assignments of error duly made.
The usual "Western Union money transfer' was introduced by defendant in evidence.
"Western Union Telegraph Company:
"Subject to the conditions below and on back hereof, which are hereby agreed to,
"Pay to Guy C. Waters,
"Street and No. Care Petersburg Hospital, Petersburg, Va. *Page 191 
"(Amount) Three hundred and twenty-five dollars and _____ cents ($325.00).
"And deliver the following message to payee at the time of payment. All can send. . . . (Signed) R. T. (G.) Dudley."
"All messages taken by this company included in a money transfer are subject to the following terms:
"To guard against mistakes or delays, the sender of a telegram should order it repeated, that is, telegraphed back to the originating office for comparison. For this, one-half the unrepeated telegram rate is charged in addition. Unless otherwise indicated on its face, this is an unrepeated telegram and paid for as such, in consideration whereof it is agreed between the sender of the telegram and this company as follows:
"1. The company shall not be liable for mistakes or delays in the transmission or delivery, or for nondelivery, of any message received for transmission at the unrepeated message rate beyond the sum of five hundred dollars; nor for mistakes or delays in the transmission or delivery or nondelivery of any message received for transmission at the repeated message rate beyond the sum of five thousand dollars, unless speciallyvalued; nor in any case for delays arising from unavoidable interruption in the working of its lines; nor for errors in cipher or obscure messages.
"6. The company will not be liable for damages or statutory penalties in any case where the claim is not presented in writing within sixty days after the telegram is filed with the company for transmission."
Defendant's witness, E. D. Doyle, manager of defendant company, at Beaufort, N.C. on cross-examination by plaintiff, was asked:
"Q. Look at this message from Cora Dudley to Robert Dudley from Petersburg, Va., filed 10 January, 1926. That passed through your office, didn't it?"
9GK 20 Petersburg, Va. 236P. Jan. 10, 1926. Robert Dudley,
Route 1, Beaufort, NCAR.
Effie is worse come at once all that can dont think she will live thru another night at Petersburg Hospital. Cora Dudley. 510P.
(Witness E. D. Doyle continued): "The message from Guy C. Waters to R. T. Dudley, Petersburg, Va., 14 January, 1926, was delivered through my office at Beaufort."
16GK. DX. 17. Petersburg, Va. 1042A. Jan. 14, 1926. Robert T. Dudley,
Dely Genl RF 1, Beaufort, NCar.
Mr. Dudley effie is no better she is passing away just as fast as time can move. Guy C. Waters. 1058A. *Page 192 
(Witness E. D. Doyle continued): "The message, Guy C. Waters, Petersburg, to Robert J. Dudley, Beaufort, filed Petersburg, Va., 9:35 a.m., 15 January, 1926, was also delivered through my office. The message from G. C. Waters, filed at Hopewell, Va., 15 January, 1926, to Robert Dudley, Beaufort, was also delivered to my office."
11 GK DX 21 2 Extra Petersburg, Va. 935A. Jan. 15, 1926. Robert J. Dudley,
Dely Gnteed Route No. 1, Beaufort, N.C.
Effie has passed out she and all the rest of us will be at Beaufort 11 o'clock tomorrow. Guy C. Waters. 1003A.
(Witness E. D. Doyle continued): "I am manager of the office at Beaufort, and was at that time."
29 GK DX 16 1 Extra Hopewell, Va. 513P. Jan. 16, 1926. Robert Dudley,
Deliver Route 1, Beaufort, NCar.
We all will be there tomorrow AM eleven o'clock be sure have some one meet us. G. C. Waters. P607P.
(The witness E. D. Doyle continued): "At the time when Mr. Dudley filed his application and paid $325 to be transmitted, plus $2.19 transfer charges, I knew a member of his family was sick, at Petersburg. I knew there was some misunderstanding about the $325 transmitted when Mr. Waters sent his message for an additional $130, and I knew Waters' wife had died. On 14 January, we had a wire from Mr. Waters, saying he had to have $130. Mr. Dudley and his son-in-law, Mr. Campen, came and said it was strange they having sent $325 that they needed more money, and I told them it had probably been delivered O.K.; that if it had not been I should have heard from the other office by that time; and when the matter was discussed with Mr. Campen, it was decided that possibly Mr. Waters had found his expenses for hospital and undertaker's bills had been greater than he anticipated, though possibly there was a slight question as to whether the money had been delivered. I offered to get a report on it, and as near as I remember, Mr. Campen was the one who declined to get a report and sent the $140 instead of the $130 asked for."
All of the telegrams were plaintiff's exhibits and duly objected to by defendant, and assignments of error made.
The issues submitted to the jury and their answers thereto were as follows:
"1. Did the defendant carelessly and negligently fail to transmit and deliver over to the plaintiff the $325, as alleged in the complaint? Answer: `Yes.' *Page 193 
"2. If so, what damage is plaintiff entitled to recover by reason thereof? Answer: `$400.'"
The defendant made numerous exceptions and assignments of error, and appealed to the Supreme Court.
The message being interstate, the damages recoverable for negligence is governed by the Federal rule pertaining to interstate messages. Hardie v.Tel. Co., 190 N.C. 45.
In Southern Express Co. v. Byers, 240 U.S. at p. 615, the Federal rule is stated as follows: "The action is based upon a claim for mental suffering only — nothing else was set up, and the proof discloses no other injury for which compensation had not been made. In such circumstances as those presented here, the long-recognized common-law rule permitted no recovery; the decisions to this effect `rest upon the elementary principle that mere mental pain and anxiety are too vague for legal redress, where no injury is done to person, property, health, or reputation.' Cooley, Torts (3 ed.), page 94." Western Union Tel. Co. v.Speight, 254 U.S. p. 17. See Rose Notes on U.S. Reports, vol. 5, p. 605.
In the Southern Express Co. case, supra, this State is recognized, among others, as one that allows damages for mental suffering or anguish. In intrastate telegrams, this rule is well settled by precedent in this State, since Young v. Tel. Co., 107 N.C. p. 370, by a unanimous Court in 1890, and has been adhered to ever since, Smith v. Tel. Co., 167 N.C. p. 248, but has no application in the present action, which is governed by the Federal rule. Although there may be negligence to make it actionable, it must be the proximate cause of the injury is ordinarily a question for the jury. . . . The question always is: Was there an unbroken connection between the wrongful act and the injury, a continuous operation? Did the facts constitute a continuous succession of events, so linked together as to make a natural whole, or was there some new and independent cause intervening between the wrong and the injury? . . . It must appear that the injury was the natural and probable consequence of the negligent or wrongful act, and that it ought to have been foreseen in the light of the attending circumstances." Milwaukee, etc., R. Co. v. Kellogg, 94 U.S. 469,24 Law Ed., 256. Inge v. R. R., 192 N.C. p. 522, Supreme Court of U.S. denied petition for certiorari 28 February, 1927. *Page 194 
In this State it is held, on the question of proximate cause, see cases cited in Clinard v. Electric Co., 192 N.C. at p. 741: "That it is not required that the particular injury should be foreseen, and is sufficient if it could be reasonably anticipated that injury or harm might follow the wrongful act."
Damages in the present action cannot be allowed under the Federal rule for mere mental suffering or anguish. Compensation under this rule can be had only for injury to person, property, health or reputation. On the question of proximate cause, evidence of attending circumstances is competent that indicates whether the natural and probable consequences ought to have been foreseen. Defendant's manager admitted: "At the time when Mr. Dudley filed his application and paid $325 to be transmitted, plus $2.19, transfer charges, I knew a member of his family was sick, at Petersburg."
It is a matter of common knowledge that money sent by telegram is out of the ordinary. The telegrams introduced by plaintiff were competent — some evidence to indicate to defendant the plaintiff's need. The record shows that defendant was at least prima facie liable (Willis v. Tel. Co.,188 N.C. p. 114), in not delivering, with reasonable diligence, the money telegraphed, and thus breached its contract. If the breach was the proximate cause of the injury to plaintiff, as alleged, he is entitled to damages for such injury, not for mental suffering or anguish, under the Federal rule, but a reasonable compensation for the wrong done. This would consist of pecuniary loss, of the extra cost and expense to him, the time lost, the physical pain or bodily suffering, the inconvenience, annoyance and fatigue.
1 Southerland, Damages (4 ed.), p. 46, says: "Compensation is the redress which the law affords to all persons whose rights have been invaded; in the nature of things, they must accept that by way of reparation. . . . (p. 47.) The universal and cardinal principle is that the person injured shall receive a compensation commensurate with his loss or injury, and no more; and it is a right of the person who is bound to pay this compensation not to be compelled to pay more, except costs. . . . (p. 49.) The law defines it generally by the principle which limits the recovery of damages to those which naturally and proximately result from the act complained of; or, in other words, to those consequences of which the act complained of is the natural and proximate cause. . . . (p. 50) These include damages for all such injurious consequences as proceed immediately from the cause which is the basis of the action; not merely the consequences which invariably or necessarily result and are always provable under the general allegation of damages in the declaration, but also other direct effects which have in the particular instance naturally ensued, and must be alleged specially to be recovered for." *Page 195 
The rule in this State is different from the Federal rule, but well stated by Bleckley, J., in Head v. Railroad, 79 Ga. 358: "Wounding a man's feelings is as much actual damage as breaking his limb. The difference is that one is internal and the other is external; one mental, the other physical. . . . At common law, compensatory damages include, upon principle and, I think, upon authority, salve for wounded feelings, and our Code had no purpose to deny such damages where the common law allowed them." Ammonsv. R. R., 140 N.C. at p. 200.
26 R.C.L., sec. 104, p. 606, et seq., says: "The courts of a number of the states hold that substantial damages may be recovered for mental anguish proximately caused by the wrongful and negligent failure of a telegraph company to transmit correctly and deliver promptly a telegraphic message, independently of any bodily or physical injury (this is the holding in this State in intrastate messages), but in other jurisdictions, and they are apparently in the majority, the rule is that damages cannot be recovered for mental anguish alone, though some of the courts laying down this rule expressly concede the liability for mental anguish accompanying physical suffering. . . . The rule that mental anguish and suffering, unattended by any injury to the person resulting from simple actionable negligence, is not a sufficient basis for an action for the recovery of damages is supported by the uniform decisions of the Federal Courts."
The physical pain or bodily suffering as an element of damages must be based on the probable and natural effect of pain or bodily suffering produced on a normal person and not one sick, unless known to defendant.
The defendant's exceptions to the evidence are sustained so far as they conform to the rule as heretofore laid down, as we understand the rule to be, under the U.S. Supreme Court decisions.
The defendant duly excepted and assigned error to the following part of the charge of the court below: "The plaintiff has offered evidence tending to show that the damage was the proximate result of the defendant's negligence; that the delay in getting the body here caused anguish, not only suffering of body, but suffering of mind, and the sufferings of the mind, gentlemen, are as real as the sufferings of the body, and are a part of the actual compensation one may recover if sustained by reasonable negligence of the defendant." The assignment of error to the charge made by defendant must be sustained. It is the rule of damages in intrastate messages, but not interstate, upon which the present action is founded.
There is a distinction in sending an ordinary telegram and a money transfer. In the latter case the money is turned over to the telegraph *Page 196 
company by the sender and the money telegraphed by it, under its system, to its agent to be delivered. In the present case the money transfer message signed by Dudley showed the three hundred and twenty-five dollars ($325) in letters and figures. It is recognized by defendant that there will be mistakes and delays in the transmission of unrepeated messages and the liability is limited to $500 under the rules of defendant company. This stipulation has been approved under the act of Congress, 18 June, 1910, 36 St. at Large, 539, by the Interstate Commerce Commission, thus recognizing that liability will occur. "On the back of the telegraph blank was the usual requirement that any claim for damages must be presented to the company in writing within sixty days after filing the message. This regulation has been held reasonable and valid in Sherrill v. Tel. Co.,109 N.C. 527, and has been often approved since." Bennett v. Tel. Co.,168 N.C. 496; Parks v. Comrs., 186 N.C. at p. 500; WesternUnion Tel. Co. v. Czizek, 264 U.S. p. 281. The defendant company has by contract made many stringent regulations, among them requiring notice of the claim within 60 days and limiting its liability — different from the ordinary contracts. Primrose v. Western Union Tel. Co.,154 U.S., p. 1. These provisions have been upheld by the United States Court and Interstate Commerce Commission. With these contract rights given to a public-service corporation that exercise a public employment, when liable, they should be held to a righteous accountability. If the facts in the present action, the probative force being for the jury, do not establish liability and the element of damages set out as we conceive them to be recoverable under the Federal rule, then telegraph companies would take this extraordinary business or field of endeavor with the incident profit and practically carry no burdens. "The distinction between punitive and compensatory damages is a modern refinement." Pizitz Dry Goods Co. v.Yeldell, U.S. Supreme Court, Advance Opinions (71 L.Ed.), 2 May, 1927, at p. 556. The distinction is now well settled law in the United States and State courts.
The United States Supreme Court has said: "Thus we speak of damages by way of compensation, or compensatory damages, as distinguished from punitive or exemplary damages, the former being the equivalent for the injury done, and the latter imposed by way of punishment." Monongahela Nav.Co. v. U.S., 148 U.S. at p. 326, 37 L.Ed., 463. "Damages in a tort action are not divided into actual, compensatory, and exemplary. The term `compensatory damages' covers all loss recoverable as matter of right. It includes all damages for which the law gives compensation, and that gives rise to the term `compensatory damages.' `Compensatory damages' and `actual damages' are synonymous terms. Pecuniary loss is an actual damage; so is bodily pain and *Page 197 
suffering. Gatzow v. Buening, 106 Wis. 1, 49 L.R.A., 475, 80 Am. St. Rep., 1." "Compensatory damages, as indicated by the word employed to characterize them, simply make good or replace the loss caused by the wrong. They proceed from a sense of natural justice, and are designed to repair that of which one has been deprived by the wrong of another. Reid v.Terwilliger, 116 N.Y. 530." 2 Words and Phrases, p. 1357.
For the reasons given, there must be a
 New trial. *Page 198 
 *Page 199