## THE SANITARY DISTRICT OF CHICAGO

*v.*

## PITTSBURGH, FT. WAYNE AND CHICAGO RY. CO. *et al.*

*Opinion filed October 14, 1905.*

1. EMINENT DOMAIN—*averments as to title are binding on the petitioner.* The averments as to the nature or extent of the estate or title of the defendants are not binding upon the defendants, and upon a proper issue the court may determine such question; but the averments are binding upon the petitioner, and the defendants are not required to establish their title.

2. SAME—*interest of defendants should be stated in petition.* A corporation seeking to condemn land should ascertain the title to the premises before commencing the proceeding and name in the petition the owner of the premises, and if the title is less than a fee simple or subject to an easement such facts should be stated in the petition.

3. SAME—*there must be some issue made as to title to justify a decision thereof.* While the Eminent Domain act contemplates only a petition and cross-petition, yet the record must show some sort of objection, issue or traverse to justify a decision by the court as to title.

4. SAME—*when general market value is not a criterion as to value of land taken.* Land covered by freight and passenger terminals and forming an integral part of an extensive railway system has a special value to the owner by reason of its particular use, and the general market value of other property is not the criterion for ascertaining compensation in condemnation, although it may tend to throw some light on the actual value.

5. SAME—*what competent in showing value of railroad terminal property.* As bearing upon the question of the value of railroad terminal property sought to be condemned, it is proper to prove the amount of business transacted, the capacity of such property for such business, and its capacity for expansion to meet the increasing demands of business.

6. SAME—*when witnesses are competent to testify as to value.* In a proceeding by a sanitary district to condemn a strip of land occupied by a railroad company as a freight and passenger terminal, witnesses who know the value of the property to the owner as a terminal are competent to testify, even though they are not familiar with the market price, per square foot, of land in that locality, and have never dealt in real estate in that way.

7. SAME—*capacity for yielding profits is an important element where land has no market value.* Where land condemned has no general market value owing to the particular use to which it is put, one of the important considerations in determining its value is its productiveness and capacity for yielding profits to the owner.

8. SAME—*when instruction as to effect of evidence of tax returns is not erroneous.* Where returns of property for taxation, not made by the owner but by its lessee, have been admitted in evidence in a condemnation proceeding, it is not error to instruct the jury that such returns are not conclusive upon the subject of value.

9. SAME—*in absence of a stipulation, damages are properly assessed on basis of immediate taking.* Damages in condemnation are properly assessed upon the basis of the taking of immediate possession by the petitioner upon payment of compensation, in the absence of any agreed plan or stipulation as to the time or manner of taking possession tending to restrict the damages which would result from the exercise of the petitioner's legal right to take such immediate possession.

APPEAL from the Circuit Court of Cook county; the Hon. R. W. CLIFFORD, Judge, presiding.

JAMES TODD, and EDDY, HALEY & WETTEN, (P. C. HALEY, and CHARLES H. PEGLER, of counsel,) for appellant.

LOESCH BROS. & HOWELL, WILSON, MOORE & McILVAINE, and HERRICK, ALLEN, BOYESEN & MARTIN, for appellees.

Mr. CHIEF JUSTICE CARTWRIGHT delivered the opinion of the court:

Appellant filed in the circuit court of Cook county its petition for the ascertainment of just compensation to be paid to appellees for that part of blocks 69, 70, 71 and 72, and that part of Monroe street vacated, all in school section 16, township 39, range 14, in the city of Chicago, lying easterly of a certain line beginning at a fixed point in the south line of Madison street and running thence southerly, by the way of other fixed points, to a point in the north line of VanBuren street, as described in the petition, for the

purpose of deepening, widening and improving the Chicago river between the south line of Madison street and the north line of VanBuren street, the eastern boundary of the tract being the center thread of the Chicago river. The Pittsburgh, Fort Wayne and Chicago Railway Company, and its lessees, the Pennsylvania Railroad Company and the Pennsylvania Company, filed their cross-petition, setting forth that the strip of land sought to be taken was a part of a tract of land constituting the passenger and freight station of the Pittsburgh, Fort Wayne and Chicago Railway Company and its lessees; that said tract was improved with a station, baggage rooms, power houses, freight houses, offices, freight tracks, team tracks and other like improvements; that it constituted the principal terminal station of the railway systems of the cross-petitioners in the city of Chicago, and that by reason of the taking of the strip to be appropriated by the petitioner the remainder of the property would be greatly damaged. It was agreed that the compensation to be paid for the lands taken and any consequent damage to the remainder should be assessed in one sum. Preliminary to the trial by jury of the amount of compensation and damage, the petitioner moved the court to ascertain and determine that the west bank of the Chicago river was upon a certain line alleged to have been established by an ordinance of the city of Chicago passed on March 16, 1857. The position of petitioner on that motion was, that the legal dock line was established by that ordinance, which at some places was west of the actual dock line in the possession of the defendants and as it had existed for many years, and that the defendants should be limited to compensation to that line, except where conveyances to the railroad company limited the easterly boundary to lines west of the dock line and where the railroad company had deeded lands away. Petitioner contended that so far as the actual dock line in the possession of the defendants was located east of the line described in the ordinance the defendants had intruded on the bed of the

river; that if the defendants caused land to be made in the river outside of the legal line they committed a wrong, and were not entitled to the possession of such made land or compensation therefor. The petitioner also contended that it should not be required to pay for the vacated end of Monroe street described in its petition, on account of certain reservations by the city, in the vacation, of a right to lay and maintain gas and water pipes and sewers therein, and because the vacated premises were to be used for the purposes of a passenger station, and were not so used but were used for freight and team tracks. The court, after hearing the evidence of the respective parties, found and adjudged that the west boundary line of the river was the line of the existing dock in front of the property; that the defendants had certain rights in Adams and Jackson streets under ordinances and contracts, and had title to the vacated part of Monroe street subject to the rights of the city of Chicago therein. To the decision of the court on these questions the petitioner excepted. A jury trial followed, resulting in a verdict finding the just compensation for the land taken and damages to the remainder to be $1,389,940. The court overruled petitioner's motion for a new trial, and petitioner excepted and prayed an appeal, which was allowed.

The proceeding before the court as to title was not based upon any issue in the pleadings. The petitioner described the property which it desired to appropriate, lying easterly of the line described in the petition, between Madison street on the north and VanBuren street on the south and having its east boundary line in the center thread of the Chicago river. As a matter of fact, the easterly part from the dock line to the center of the river was submerged by the waters of a navigable stream and was already subject to the easement of navigation. The statute requires a petition setting forth a description of the property sought to be taken with the names of the persons interested, as owners or otherwise, and if the estate sought to be condemned is a limited one

or subject to conditions or restrictions, either in the title or mode of use, or if it is encumbered by some public easement or right, it should be set out in the petition. The averments of the petition as to the nature or extent of the estate or title of the defendants are not binding on the defendants, and upon a proper issue the court may determine such questions, but such averments are binding on the petitioner, and the defendants are not required to establish their title. (*Peoria and Rock Island Railway Co.* v. *Bryant,* 57 Ill. 473.) If a corporation entitled to exercise the right of eminent domain claims that it already has a right to take land, a petition for condemnation is not the proper proceeding to try that question. It was the duty of the petitioner to ascertain the title to the premises before commencing the proceeding and to name in the petition the owner of the premises, and if the title was less than a fee simple or subject to an easement it should have been stated in the petition. (*Peoria, Pekin and Jacksonville Railroad Co.* v. *Laurie,* 63 Ill. 264.) There was no averment on the subject in the petition, and, so far as it was concerned, the defendants were to be regarded as the owners of an unencumbered title. They were in the actual possession of the land to the existing dock line and had been for many years, and under the petition they were not required to prove title. While only a petition and cross-petition are contemplated by the statute, the record must show some sort of objection, issue or traverse to justify a decision by the court as to title, and in this case there was nothing of the kind. But although the proceeding was irregular and not authorized by any rule of practice the parties joined in it without objection, and offered evidence as to what part of the land was already subject to the easement of navigation and to what line the defendants were legally entitled to occupy. If it may be considered that the defendants waived their right to have the question submitted on proper pleadings, we think the conclusions of the court were correct.

The charter of the city of Chicago in force in 1857 gave
the city power to widen and improve the Chicago river, and,
inferentially at least, to establish dock lines, and required
the council to give notice to the owner of an intention to
appropriate land for widening the river. After such notice,
commissioners were to be appointed to ascertain and assess
the damages and compensation due the owners of land taken
and to assess such damages on property benefited by the im-
provement. On March 16, 1857, an ordinance was passed
which was approved on March 18, 1857, establishing dock
lines on each side of the Chicago river from Madison street
to VanBuren street. On March 23, 1857, the city clerk was
directed to advertise in the corporation newspapers that the
common council intended to take and appropriate so much
land as was necessary to straighten and widen said river
from Madison street to VanBuren street, in accordance with
a survey on file in the clerk's office. On April 3, 1857, com-
missioners were appointed to assess the damages for widen-
ing the river from Madison street to VanBuren street, and
on April 20 two commissioners were appointed in place of
two of the original commissioners. On April 27, 1857, there
was a report to the council by a committee, recommending
that the east line of the survey for the purposes of widening
the river should be on a certain line east of said first sur-
vey, and this was concurred in by the council. On May 11
a commissioner was appointed in place of another, and on
May 14 another commissioner was substituted. The ordi-
nance establishing the dock lines could not be changed except
by another ordinance, but all the evidence showed that the
ordinance was preliminary to a condemnation proceeding
for the purpose of widening the river and establishing the
dock lines; that while the proceeding was still incomplete
the council concluded to change the west line from the sur-
vey, and that the plan was never carried into effect. So far
as the record shows, nothing further was ever done in the
matter, and in 1881 an ordinance was passed for widening

the river between Adams street and VanBuren street and condemning therefor certain premises, and a petition was filed in court for the condemnation of the same but was never brought to trial. The evidence showed that the dock between Madison and Adams streets was originally constructed on the present line in 1856 and has been re-constructed several times on the same line. There was evidence that in making excavations between Adams street and VanBuren street it was found that the shore line was at some time west of the dock line and that there were remains of an old dock west of said line, but the present dock had existed for a great many years and had been in the possession of the defendants, and so far as the evidence shows the dock was placed where the owners of the abutting land had the legal right to place it, not beyond the line of navigability of the stream and not obstructing navigation or impairing the rights of others. (*City of Chicago* v. *Laflin,* 49 Ill. 172.) The greater part of the line was not in dispute, and there has never been any controversy between the city of Chicago and the defendants in regard to the location of the dock.

The station grounds are about fifteen feet below the level of the adjacent streets, and Adams and Jackson streets are carried over the grounds by means of viaducts constructed by the railroad company under contracts and ordinances, and the defendants have the right to lay tracks on the grounds under the viaducts. Monroe street from Canal street to the dock line was vacated by the city of Chicago so long as it should be used for railroad passenger and depot purposes, and no longer. The lots abutting on the street had been sold and conveyed, and the plat not being made, certified and acknowledged in accordance with the statute, amounted to a common law dedication, so that the abutting owners took title to the center of the street subject to the easement. On the vacation the title to the street was in the defendants as abutting owners, subject to the condition upon which the vacation was made. The passenger station does not extend

from Canal street to the river. The passenger building extends across Monroe street next east of Canal street, and the train-shed and passenger tracks are east of that building but do not extend to the river. The defendants had been in possession of the premises since 1861. If there was a breach of the condition subsequent as to that part next the river, which the city could take advantage of, there had been no election by the city to do so by a re-entry or any equivalent act. The city never declared a forfeiture or took possession for a breach of the condition. The finding of the court was that the defendants were owners subject to the rights of the city in the vacated streets, and the finding was not incorrect.

On the trial before the jury the petitioner produced a number of witnesses who had had experience in dealing in real estate in the city of Chicago, who testified that the strip to be appropriated to the uses of the petitioner had a market value by the square foot, and they gave their opinion as to such value, varying from $8 to $9.22 per square foot. An average of their testimony showed the value of the land taken to be $503,012.06. The cost of building docks and improvements, including buildings, tracks, etc., was estimated by them at $300,945.68, making a total of $803,-957.74. Adding to this the cost of handling freight at other points for one year during re-construction of the terminal, which was estimated at $82,887, the total compensation and damages would be $886,844.74. On the part of defendants a number of witnesses who were familiar with the nature of such property and the use to which it was devoted as a freight terminal and an essential part of the railway system, gave their opinions that the entire terminal property was worth about $15,000,000, and that the value of the part taken, with the damage to the remainder, would be about $5,000,000. The jury, as before stated, fixed the compensation and damages at $1,389,940, which was above the estimates of the petitioner's witnesses and very far below the amount testified to by the witnesses for the defendants.

It is urged that the court permitted witnesses for the defendants to testify to the value of the property without qualifying themselves to give an opinion on the subject, and on the other hand it is insisted that the testimony of the witnesses for the petitioner was based on the value per square foot of real estate in the city of Chicago disconnected from the use to which the property was put as a railway terminal, divested of its character as such a terminal and separated from the railway system of which it was an integral part. The property taken constituted part of the freight and passenger terminal of the railways of the defendants in the city of Chicago and amounted to about one-sixth of such terminal, and it is conceded that it would be necessary to entirely re-construct the freight department of the terminal station on a new plan, with new freight houses and new conveniences for doing business. The terminal was in the center of the largest manufacturing and commercial district in the city of Chicago, and had great practical advantages in being close to the center of traffic and therefore easily accessible. The witnesses for the petitioner stated that they took into account the use to which the property was put and its adaptability to such purpose, and that it had a market value, which they stated. But it is perfectly clear from their testimony that none of them had any definite idea of the value of the property to the owner in connection with the use to which it was put. Their estimates of value per square foot were on the basis of ordinary real estate sold in the market in that way. The witnesses for the defendants did not know the market value, by the square foot or otherwise, of property in the city of Chicago and had not dealt in real estate in that way, but they knew the value of the property as a freight terminal and were fully qualified to give their opinions on that subject. The jury were called upon to determine the value of an integral portion of a freight terminal which was a part of extensive railway systems, and the damage to the residue, and it was property which had no market value.

Where lands proposed to be taken have a market value, such value is the standard of just compensation because it will give to the owner all he is entitled to under the law. But that method of valuation cannot be applied to property which has no market value. The constitution and the law require that the owner of property shall receive such compensation that he will be as well off after the taking as he was before. To do that it is necessary to determine what the property is worth to the owner, and unless he receives what it is worth to him he does not receive just compensation. It is matter of common knowledge that such property as this and devoted to such a use is not bought and sold in the market or subject to sale in that way, and that such property has no market value in a legal sense. The property being devoted to a special and particular use, the general market value of other property was not a criterion for ascertaining compensation, although it might throw some light on the actual value.

One of the important considerations in ascertaining the value of property which has no market value is its productiveness and capabilities for yielding profits to the owner. The court admitted evidence of the extent of the business done at the terminal station, and witnesses for the defendant based their estimates of the value of the whole property, the part taken and the damage to the residue, upon the business handled at the station and the profits of such business. It is insisted that the court erred in admitting such evidence, which enabled the witnesses for the defendants to arrive at an intelligent estimate of the value of the property. We think there was no error in admitting the evidence. Although the profits of a business do not determine the value of land, it is proper to show, in arriving at the market value, that it is valuable for certain purposes and productive to the owner. (*DeBuol* v. *Freeport and Mississippi River Railway Co.* 111 Ill. 499.) The extent of the business done upon the property necessarily affected its value, and the prof-

its of the business were neither made a test of value nor allowed as compensation. There was no ruling of the court or any instruction under which profits could be or were allowed, but the productiveness, capabilities, location and amount of business done was a proper matter to be before the jury. It is conceded that the defendants had a right to show the use to which the property was devoted and how it was used at the time of filing the petition, and we think it was proper to prove, as bearing on its value, the amount of business transacted, the capacity of the property for such business and its capacity for expansion to meet the increasing demands of business. Where property, by reason of being applied to a particular use, has a particular value to the owner, that value is to be ascertained and allowed as compensation. *Lake Shore and Michigan Southern Railway Co.* v. *Chicago and Western Indiana Railroad Co.* 100 Ill. 21; *Chicago and Northwestern Railway Co.* v. *Chicago and Evanston Railroad Co.* 112 id. 589; *Chicago and Western Indiana Railroad Co.* v. *Englewood Connecting Railway Co.* 115 id. 375; *Chicago, Burlington and Quincy Railroad Co.* v. *City of Naperville,* 166 id. 87.

Complaint is made of the eighth instruction given at the request of defendants. The court had admitted in evidence returns for taxation made by the Pennsylvania Company, lessee of the owner, on which the value of the whole property was given at less than half the value as shown by the evidence for the petitioner. The instruction stated that the returns did not purport to be made by the Pittsburgh, Fort Wayne and Chicago Railway Company, but by the Pennsylvania Company, the lessee; that said returns were not admitted as proving the value of the property on the market for sale or to the owner, but as having a bearing on the question of value; that it was the duty of the jury to determine the real value of the property, and unless the returns for taxation represented the real value the jury should award to the owner such real value. The defendants protested,

and now protest, that the returns were not admissible in evidence. But that question is not before us on this appeal. On the question whether a return for taxation is admissible in evidence as tending to show the value of property there is a conflict of authority, and we do not express any opinion upon the subject, but they are not held, in any case, to be a criterion of value or conclusive. The returns did not purport to be made by the owner of the property and therefore had no force as admissions of value, and whether admissible in evidence or not, there was no error in giving the instruction to the effect that they were not conclusive.

In the statement of facts preceding the brief and argument of counsel in support of the errors assigned, there is a statement that the court gave an instruction informing the jury that under the law petitioner had a right to stipulate and agree on the trial of the case as to the time after the entry of judgment when it would cut away the strip condemned, and that, no such stipulation or agreement having been made, if the jury found, from the evidence, that the time taken to remove the strip would enter into and affect the amount of damages to the remainder, they should estimate the same on the basis of what would be the ordinary and usual consequences of cutting away and removing the strip and the damages resulting therefrom. The instruction is not mentioned in the brief or in the argument in support of the brief, and therefore it is perhaps not necessary to notice it. It seems, from the statement of facts, to be regarded by counsel as objectionable, but there was no error in giving it. If the petitioner desired the damages assessed on the basis that it would do the work of removal in any particular manner or give any particular time for re-construction and adjustment of the property to the uses to which it was devoted, or would do anything which would limit or restrict the damages resulting from the exercise of its legal right to remove the strip on payment of compensation, it should have presented some plan, stipulation or agreement

to that effect. If that had been done the damages would have been assessed on the basis of the plan or stipulation, but in the absence of anything of the kind it was proper for the jury to assess damages in view of the legal right of the petitioner to enter upon the premises upon payment of the compensation ascertained.

We find no error in the record and the verdict was not against the preponderance of the evidence.

The judgment is affirmed.              *Judgment affirmed.*