258 F.2d 17
 UNITED STATES of America, Plaintiff-Appellant, Appellee,
v.
93.970 ACRES OF LAND, MORE OR LESS, SITUATE IN COOK COUNTY, State of ILLINOIS, and Illinois Aircraft Services and Sales Company, Incorporated, Defendant-Appellee, Appellant.
 No. 12191.
 No. 12192.
 United States Court of Appeals Seventh Circuit.
 July 15, 1958.
 
 COPYRIGHT MATERIAL OMITTED James L. O'Keefe, George W. Lennon, J. Herzl Segal, Leonard R. Hartenfeld, James F. Ashenden, Jr., Chicago, Ill., for 93.970 Acres of Land, etc.
 Perry W. Morton, Asst. Atty. Gen., S. Billingsley Hill and Roger P. Marquis, Attys., U. S. Department of Justice, Washington, D. C., Robert Tieken, U. S. Atty., Chicago, Ill., John Peter Lulinski and Luther D. Swanstrom, Asst. U. S. Attys., Chicago, Ill., for the United States.
 Before MAJOR, FINNEGAN and SCHNACKENBERG, Circuit Judges.
 MAJOR, Circuit Judge.
 
 
 1
 This is a condemnation proceeding instituted by the United States to acquire all outstanding rights, if any, which defendant had in premises in Cook County, Illinois, on which was located an airport, under lease from the government. The lease under which defendant occupied the premises was executed May 2, 1947, with certain modifications made February 9, 1948. The lease granted to lessee (defendant) the option of renewing the lease for a period of five years. This the lessee did. Thus, the lease as renewed extended to May 2, 1957. The lease contained a provision which authorized its revocation by the lessor under certain conditions, subsequently discussed. The government sought to exercise this power of revocation, effective September 27, 1954. Copies of the lease, the amendment thereto and the government's notice of revocation are attached to and made a part of the complaint.
 
 
 2
 Defendant refused to honor the notice of revocation and vacate the property. On August 10, 1954, it sought in the District Court a declaratory judgment that the revocation was ineffective because the government proposed to use the property for purposes other than those described in the lease as a basis for its right to revoke. The defendants in that action refused to waive immunity and moved to dismiss the complaint for lack of jurisdiction. Thereupon, plaintiff in that action withdrew its complaint. The government instituted the instant action October 6, 1954, and was awarded immediate possession of the premises, with certain reservations not here material. The government by its condemnation action sought to acquire "all remaining outstanding right, title and interest, if any" of defendant in the property and to ascertain "just compensation, if any."
 
 
 3
 Defendant in its answer to the complaint sought just compensation for the remaining term of the lease, that is, for a period of about 2½ years, or until May 1, 1957. It admitted receiving the notice of revocation but alleged that it was ineffective because it was not made in conformity with the terms of the lease. Defendant's answer also alleged that in filing a condemnation action, instead of ejectment or a similar action, the government elected "a remedy which is inconsistent with the theory that defendant has no possessory right and therefore implicitly recognizes the existence of a leasehold interest and is precluded as a matter of law from asserting that the lease has been terminated."
 
 
 4
 The government moved to strike defendant's answer, and for findings and judgment that defendant was not entitled to possession after September 27, 1954, and was, therefore, entitled to no compensation. The basis for the motion was that the answer set up no valid defense because defendant's tenancy expired by reason of the revocation, notice of which defendant admittedly received, which effectively terminated its interest on September 27, 1954, and for the further reason that the necessity for taking by the government was not a matter for judicial inquiry. Upon denial of this motion, the government moved for summary judgment of no compensation on the basis that there was no issue of fact concerning the lease and its revocation and that as a matter of law the lease was validly revoked prior to commencement of the action. This motion was also denied.
 
 
 5
 The case was tried before a jury on the issue of compensation. At the inception of the trial the Court ruled that the government could not introduce in evidence or make any reference to the revocation notice, for the reason that it had selected the remedy of condemnation which necessarily acknowledged an outstanding leasehold interest in defendant for the full part of the term remaining, October 6, 1954 to May 1, 1957. Much testimony was offered by each of the parties as to the value of the remaining leasehold interest. It is unnecessary at this point to relate this testimony. It is sufficient to note that the witnesses for the government, based on its interpretation of the lease, testified that the interest sought to be taken had no value and as a result the government was entitled to a finding of no compensation. On the other hand, defendant's witnesses, based on its interpretation of the lease placed various estimates upon the value of defendant's remaining interest in the lease.
 
 
 6
 At the conclusion of the evidence, the government's motion for a directed verdict of no compensation was denied. Consistent with this ruling and also with that made at the inception of the trial, the Court denied the government's request for the submission to the jury of a form of verdict which would have permitted a possible finding of no compensation. The jury returned a verdict in the amount of $25,000, and on April 16, 1957, judgment was entered in said amount in favor of defendant. After a consideration and disposal of various motions the Court, on July 9, 1957, filed findings of fact and conclusions of law wherein it found and concluded that defendant was entitled to an additur of $50,000 (making a total base award of $75,000), with interest at 5% from October 6, 1954, the date of taking. On the same date the Court entered what it labeled an "amended judgment," in which it was recited that defendant was entitled to an award of $85,375.02. It is evident that this judgment included $50,000, the amount allowed as additur; $25,000, the amount awarded by the jury, and $10,375.02, interest on the sum of $75,000 from the date of taking.
 
 
 7
 The government has appealed from the so-called amended judgment of July 9, 1957. No mention is made in its notice of appeal of the judgment entered April 16, 1957 (the first judgment). Defendant cross-appealed from the so-called amended judgment of July 9, 1957 (the second judgment) in its favor, on the ground that the Court erred in failing to increase the award to the lowest level of value established by uncontradicted testimony. This so-called uncontradicted testimony refers to that offered by defendant upon its theory of the case, which was that embraced by the trial Court.
 
 
 8
 We are met at the inception with the important and troublesome contention advanced by defendant that the government, having appealed only from the so-called amended judgment of July 9, 1957, is precluded from here raising any issue other than that relative to the allowance of an additur. More specifically, it is contended that the government by its failure to appeal from the judgment of April 16, 1957, is without right to a review of the issues both of law and fact which were raised and decided in the trial which resulted in that judgment. The importance of this contention is at once apparent because, if sustained, it is decisive of all issues other than that which relates to the Court's allowance of the additur. We have, therefore, up to this point stated only such of the proceedings as we deem essential to bring into focus the instant question.
 
 
 9
 It is hardly open to doubt but that the first judgment standing alone was final and, therefore, appealable. It is equally certain that the Court, either on its own volition or at the instigation of the parties, possessed the authority within an appropriate time to vacate, modify or amend that judgment. We also think that in determining the question of the finality of the first judgment it should not be confined in a vacuum, separate and apart from the proceedings which followed.
 
 
 10
 On April 22, 1957, the government filed its motion to vacate the April 16 judgment and prayed that a judgment of no compensation be entered for plaintiff, notwithstanding the jury verdict. On April 24, 1957 (eight days after the entry of the judgment), defendant filed its motion calling attention to the fact that the judgment did not include interest, and prayed "that the judgment heretofore entered herein be altered or amended" to include interest. On the same date, defendant filed its motion for additur or, in the alternative, for a new trial. In this motion defendant prayed "that the Court substantially increase the jury's verdict by an additur and enter an amended judgment for the amount of such increased award" or, in the alternative, grant defendant a new trial.
 
 
 11
 Thus, in two respects defendant sought to amend the judgment: first, by the addition of interest and, second, by the allowance of an additur. That the defendant succeeded in both respects is evidenced by the fact that the second judgment included interest and the allowance of an additur. The second judgment also specifically included $25,000, the amount of the jury award, which had been incorporated in the first judgment. It is not discernible how it can be logically held that there are now two final judgments (defendant's contention requires such a holding). It is certain that defendant would not be entitled to a satisfaction of both judgments. Satisfaction of the second would ipso facto satisfy the first. Conversely, satisfaction of the first would entitle the government to a pro tanto credit on the second. In our view, the first judgment was merged in and became a part of the second. By such merger the first judgment was obliterated as effectively as if it had been expressly vacated by the Court. It is evident that the parties as well as the Court intended such result. Moreover, the result was accomplished at the behest of defendant which, as shown, was urging the Court to enter an "amended judgment," not another judgment separate and distinct from the first.
 
 
 12
 Defendant in its brief asserts that its contention on this issue is "completely supported" by the following cases: Federal Trade Commission v. Minneapolis-Honeywell Regulator Co., 344 U.S. 206, 73 S.Ct. 245, 97 L.Ed. 245; Durkin v. Mason & Dixon Lines, Inc., 6 Cir., 202 F.2d 425, and Delta Drilling Co. v. Arnett, 6 Cir., 186 F.2d 481. In our view, these cases furnish feeble, if any, support for defendant's contention. It is pertinent to note that none involved a condemnation proceeding. In the Honeywell case there was involved a cease and desist order issued by the Federal Trade Commission, and the question before the Court was whether the petition for certiorari had been filed in the time designated by statute. A solution of this question required a determination as to when the statutory period commenced to run, that is, from an order of July 5, 1951 or from an order of September 18, 1951 (orders of this Court on petition for review). True, the Court held that the first order was final, but upon the basis that it had not been substantially altered by the second order. As the Supreme Court stated concerning the second order (344 U.S. at page 212, 73 S.Ct. at page 249), "It reiterated, without change, everything which had been decided on July 5." Relative to the issue of finality, the Court in its discussion stated (344 U.S. at page 212, 73 S.Ct. at page 249):
 
 
 13
 "The test is a practical one. The question is whether the lower court, in its second order, has disturbed or revised legal rights and obligations which, by its prior judgment, had been plainly and properly settled with finality."
 
 
 14
 The Durkin case involved an action for failure to pay overtime wages. Two periods of time were involved. As to the first, the trial Court dismissed the claim, but allowed recovery as to the second for an amount which was to be determined in accordance with a pre-trial stipulation of the parties. The Court of Appeals held that the order was final because it "settled all the equities between the parties and finally determined their rights."
 
 
 15
 The Arnett case involved the title to or ownership of certain oil and gas rights, with a prayer for an accounting. Two judgments were entered in the case and the Court of Appeals held that the first judgment was final because it settled the case on the merits. Nothing was added to the second judgment other than the result which flowed from an accounting which had been provided for by the first judgment.
 
 
 16
 It appears settled by the cases that just compensation is a material issue in every condemnation suit and that there can be no finality of judgment until this issue is definitely disposed of. In McCandless v. United States, 298 U.S. 342, 348, 56 S.Ct. 764, 766, 80 L.Ed. 1205, the Court stated:
 
 
 17
 "In an eminent-domain proceeding, the vital issue — and generally the only issue — is that of just compensation."
 
 
 18
 In Catlin v. United States, 324 U.S. 229, 65 S.Ct. 631, 89 L.Ed. 911, the Court had before it the issue of the finality of a judgment in a condemnation proceeding. In its discussion the Court made the following pertinent statement (324 U.S. at page 233, 65 S.Ct. at page 633):
 
 
 19
 "Hence, ordinarily in condemnation proceedings appellate review may be had only upon an order or judgment disposing of the whole case, and adjudicating all rights, including ownership and just compensation, as well as the right to take the property. This has been the repeated holding of decisions here."
 
 
 20
 The same rationale was followed in United States v. Richardson, 5 Cir., 204 F.2d 552, 555.
 
 
 21
 We are not able to discern how it can be held that the first judgment, in view of subsequent proceedings, disposed of the whole case or that defendant can consistently contend that it was an award of just compensation for the property right sought to be taken. This is so even though it be thought that such judgment standing alone possessed all the indicia of finality under the rationale of the Supreme Court in Catlin. Its finality, if such it had, at the time of entry was emasculated by subsequent proceedings which culminated in the second judgment from which the appeal is taken. It is, therefore, our view and we so hold that the government by its appeal from the second judgment is entitled to a review of the issues which it here presents.
 
 
 22
 We now come to the contested issues relating to the proceedings in the District Court. As stated in the government's brief (with no objection on the part of defendant), they are as follows:
 
 
 23
 "1. Whether, in this condemnation proceeding by the United States to reacquire possession and to clear title to property which it had leased to Illinois Aircraft Company, the district court erred in refusing to enter judgment of no compensation on the basis of prior revocation of the lease because it ruled (a) that the use of a condemnation action constituted election of a remedy which admitted an outstanding leasehold interest and (b) that the lease had not been validly revoked under its terms.
 
 
 24
 "2. Whether, on the issue of the value of the remaining term of the leasehold which had to be tried under the foregoing rulings, the court erred (a) in stating before the jury that it would set aside a verdict of no compensation, (b) in receiving evidence of gross and net income from the airport operation or the trailer and barracks housing operation, (c) in receiving piecemeal valuations for the separate operations on the property and (d) in receiving evidence of value based on a construction that the lease was not revocable except `for Naval aviation uses' and that it authorized use of the property for a trailer park and barracks housing not related to the airport function.
 
 
 25
 "3. Whether the court erred in trebling the verdict of the jury by purported additur and in awarding interest on the enlarged award."
 
 
 26
 Defendant enumerates other contested issues, all of which relate to the additur which the Court included in its second judgment of July 9, 1957. These issues are here by reason of defendant's cross-appeal. They need not be stated at this point as their relevancy will depend upon our disposition of the issues raised by the government.
 
 
 27
 Prior to the commencement of the trial, the Court ruled that the government could not introduce in evidence or make any reference to the revocation notice (which the government had served on defendant), on the ground that the government had selected the remedy of condemnation, which necessarily acknowledged an outstanding leasehold interest in defendant for the unexpired portion of the lease, that is, from October 6, 1954 to May 1, 1957. In connection with this ruling the Court stated:
 
 
 28
 "The court presumes that the Government knew what it was doing, it had some advantage to gain by filing a proceeding under condemnation rather than following the other procedure, which raised a very highly technical point in controversy which the Government sought to avoid, and properly, in my judgment." Also, at the beginning of the trial, the Court stated in the presence of the jury:
 
 
 29
 "If they [the jury] found no money at all, counsel, I would be compelled to grant a new trial, and we would be wasting their time, and this should not be submitted to the jury except on the basis of finding a fair value, and no value would be just the kind of a verdict I would have to reverse."
 
 
 30
 Consistent with this ruling, the Court denied a request by the government for a directed verdict and also a request that there be submitted to the jury a form of verdict to be used in the event the jury found that defendant was entitled to no compensation.
 
 
 31
 The parties devote much effort to the question as to whether the issue of election of remedies in a condemnation suit is to be determined by Federal or State law. In our view, we need not be concerned with this question because the reasoning employed by both the Federal and State courts of Illinois leads to the same result. A more disturbing matter is the dearth of cases in both jurisdictions which have considered the doctrine in condemnation proceedings.
 
 
 32
 We shall first refer to Federal cases other than those in condemnation, where the doctrine has been discussed and applied. In Henderson Tire & Rubber Co. v. Gregory, 8 Cir., 16 F.2d 589, 593, 49 A.L.R. 1503, the Court cites many cases in support of the statement that the doctrine is widely recognized both in Federal and State courts. From the cited cases the Court concluded:
 
 
 33
 "(1) The essential elements of the doctrine are (a) the existence of the two remedies; (b) the inconsistency between the remedies; (c) the choice of one of the remedies."
 
 
 34
 The doctrine was applied in Intertype Corp. v. Pulver, D.C., 2 F.Supp. 4, 6 (affirmed 5 Cir., 65 F.2d 419). In that case it was held that replevin would not lie because plaintiff had previously sought unsuccessfully to foreclose a chattel mortgage on the same property. In Van Winkle v. Crowell, 146 U.S. 42, 13 S.Ct. 18, 36 L.Ed. 880, it was held that a seller was precluded from maintaining an action of detinue to recover property after attempting, although unsuccessfully, to enforce a lien thereon. In United States v. Oregon Lumber Co., 260 U.S. 290, 43 S.Ct. 100, 67 L.Ed. 261, it was held as to a voidable sale of lands on account of fraud that the plaintiff was entitled to either disaffirm and recover the lands or affirm and recover damages for the fraud, but that it could not do both. After holding that the rule was applicable to the government, the Court stated (260 U.S. at page 295, 43 S.Ct. at page 101):
 
 
 35
 "Any decisive action by a party, with knowledge of his rights and of the facts, determines his election in the case of inconsistent remedies, and one of the most unequivocal of such determinative acts is the bringing of a suit based upon one or the other of these inconsistent conclusions."
 
 
 36
 Of the numerous other instances where the doctrine under consideration has been recognized in the Federal courts, see Bierce v. Hutchins, 205 U.S. 340, 346, 27 S.Ct. 524, 51 L.Ed. 828; Zimmerman v. Harding, 227 U.S. 489, 33 S. Ct. 387, 389, 57 L.Ed. 608.
 
 
 37
 Now, turning to Illinois cases, we note those wherein the doctrine has been applied in condemnation proceedings. In Metropolitan City Railway Co., v. Chicago West Division Railway Co., 87 Ill. 317, at page 322, the Court stated:
 
 
 38
 "Petitioner, after invoking the aid of the law to condemn certain property of defendant, will not be permitted to stultify itself by insisting defendant has no interest in that which it seeks to condemn to its own use under the Eminent Domain act."
 
 
 39
 In Sanitary District of Chicago v. Pittsburgh, Ft. Wayne and Chicago Ry. Co., 216 Ill. 575, 75 N.E. 248, the Court held that the averments of the petition as to defendants' interest or title were binding on petitioner but not on the defendants. The Court stated (216 Ill. at page 579, 75 N.E. at page 250):
 
 
 40
 "If a corporation entitled to exercise the right of eminent domain claims that it already has a right to take land, a petition for condemnation is not the proper proceeding to try that question. It was the duty of the petitioner to ascertain the title to the premises before commencing the proceeding and to name in the petition the owner of the premises, and, if the title was less than a fee simple or subject to an easement it should have been stated in the petition."
 
 
 41
 In Department of Public Works and Buildings v. Sohm, 315 Ill. 478, 146 N.E, 518, the Court in a condemnation case, on facts similar in many respects to those of the instant case, held that the right of possession was not a proper issue in condemnation but that it should be determined in ejectment. The Court among other things stated (315 Ill. at page 483, 146 N.E. 518, 520):
 
 
 42
 "The proceeding is special, statutory, and summary, its sole object is to ascertain the compensation to be paid, and the amount is the only issue."
 
 
 43
 The Court reiterated what it had previously held, that averments in the petition as to title are binding on petitioner and that petition for condemnation is not a proper proceeding to vindicate a right which petitioner otherwise has to take the land.
 
 
 44
 The Federal courts recognize, as do the Illinois courts, that the sole object of condemnation is to ascertain just compensation for that which is taken. Reiterating our previous quotation from McCandless v. United States, 298 U.S. 342, 348, 56 S.Ct. 764, 80 L.Ed. 1205:
 
 
 45
 "In an eminent-domain proceeding, the vital issue — and generally the only issue — is that of just compensation."
 
 
 46
 In Danforth v. United States, 308 U.S. 271, 284, 60 S.Ct. 231, 236, 84 L.Ed. 240, the Court stated:
 
 
 47
 "Condemnation is a means by which the sovereign may find out what any piece of property will cost."
 
 
 48
 The government argues that claims based on liens or contracts may be settled, and clouds on titles resolved, in condemnation proceedings. This is true no doubt where such claims or rights are incidental to the taking of property, for which just compensation is to be awarded. The government in support of this contention cites Eagle Lake Improvement Co. v. United States, 5 Cir., 160 F. 2d 182, and National Refining Co. v. United States, 8 Cir., 160 F.2d 951. Neither case is of any aid to the government. In the Eagle case the question was as to the manner of dividing the compensation award between a fee owner and a lessee. However, the Court made the pertinent observation (160 F. 2d at page 184):
 
 
 49
 "A condemnation proceeding is an action in rem. It is not the taking of rights of designated persons, but the taking of the property itself."
 
 
 50
 The National Refining case is even more remote. In that case the compensation award was paid by the government into the registry of the Court and the litigation was between rival claimants to the fund.
 
 
 51
 The government asserts that condemning property of which it claims ownership is common practice. In support of the statement it cites United States v. San Geronimo Development Co., Inc., 1 Cir., 154 F.2d 78; Wittmayer v. United States, 9 Cir., 118 F.2d 808, and United States v. 10,245 Acres of Land, D.C., 50 F.Supp. 470. The nebulous support which these cases furnish the government's assertion is an indication of the weakness of its position. In none was it sought to invoke the doctrine of election of remedies. It is true that in the San Geronimo case the Court reluctantly approved a petition for condemnation which contained a provision that it was without prejudice to the right of the government to dispute the claim of any party for compensation. The Court did this after characterizing the proceeding (154 F.2d at page 80) as an "unfamiliar hybrid, and the substantive question upon which the decision turns is a special and non-recurring one as to which there are no precedents to indicate the answer." There is nothing in Wittmayer of any pertinency. In the 10,245 Acres of Land case, the government in connection with the declaration of taking made a deposit of estimated value. It developed, however, that the person who laid claim to the homestead (the premises sought to be condemned) had not perfected his rights and had no interest therein. In the action reported it was held that the government was entitled to a return of its deposit. The case has no bearing here.
 
 
 52
 The government points out what undoubtedly is a fact, that it might have proceeded in ejectment in order to secure possession. From this premise it argues that the defendant has not been hurt by the instant proceeding because if the government had obtained possession in an ejectment action, defendant would have been relegated to the filing of a claim in the Court of Claims, to which the government could have pleaded that it had no interest because of the revocation of the lease. In our view, this argument is beside the issue. We are not concerned with what the rights of the parties might have been had the government proceeded in some other form of action. We are now concerned only with the rights in the condemnation proceeding which the government elected to pursue.
 
 
 53
 Defendant places much reliance upon a decision of this Court, United States v. Chicago, B. & Q. R. Co., 7 Cir., 90 F.2d 161. In that case the government contended that the defendant had failed to establish any interest in a certain portion of the condemned property. The Court, after noting that the action was prosecuted in accordance with the laws of Wisconsin, stated (at page 171):
 
 
 54
 "It is the law of that state that where proceedings are instituted to condemn property, and the petition recites, as it must, title and ownership or interest by the defendant, the condemnor is thereby bound by such expressed recognition of title, and cannot be heard to assert the contrary nor compel one recognized as owner to prove or defend his title."
 
 
 55
 The Wisconsin rule thus announced and followed by this Court is no different, as previously shown, from that adhered to by the courts of Illinois.
 
 
 56
 In United States v. 11.48 Acres of Land, 5 Cir., 212 F.2d 853, the Court employed similar reasoning and reached the same result. In that case the government condemned the fee simple title and attempted to defeat the payment of just compensation on the contention that the contemplated use would be a mere exercise of the government's dominant servitude over navigable waters. In short, the government contended that it should not be required to pay just compensation because it had an existing right to use that which it sought to condemn. The condemnee argued "that the Government has elected to take his riparian rights by eminent domain and that he is therefore entitled to just compensation." The Court, in sustaining the latter contention, stated (at page 855):
 
 
 57
 "We think that the appellee's alternative contention is sound, and, hence, we do not reach the question of whether the use intended by the Government would be a mere exercise of its servitude over navigable waters. Appellee's property was always subject to that dominant servitude. Its exercise involved no taking of private property within the meaning of the Fifth Amendment, and necessitated no condemnation proceeding. The United States has elected to take the fee simple, absolute, and indefeasible title to the lands."
 
 
 58
 The government concedes that it had remedies, other than that of condemnation, by which it might have obtained possession of the property in controversy. This it could have done without the payment of any compensation on its theory that defendant's interest in the leasehold property had been extinguished by the government's revocation made in conformity with the terms of the lease. Instead, it elected to institute the instant action to condemn defendant's leasehold interest. It thus, as must be done in all condemnation cases, invoked the jurisdiction of the Court for the purpose of determining just compensation to be awarded for that which it sought to condemn. In reality, that was the sole issue to be tried in the District Court.
 
 
 59
 In our view, the trial Court properly ruled that the government was without right to rely upon its purported revocation of the lease. Such a position was entirely inconsistent with its condemnation complaint. In the same breath, the government proclaimed and denied defendant's ownership of the leasehold estate. Such an absurd position is not countenanced by law, as we understand it, and neither is it supported by logic, reason or common sense.
 
 
 60
 This brings us to the rulings of the Court as well as the testimony of the respective parties relative to the just compensation to be awarded. This requires some consideration of the terms of the lease, because the extent of defendant's claim or interest in the leasehold estate is dependent upon such terms. This is forcibly illustrated by the testimony of the witnesses for the respective parties on the issue of just compensation. Witnesses for the government, based upon its interpretation of the lease, testified that defendant's interest had no value, while defendant's witnesses, predicated upon its interpretation, testified that defendant's interest had great value.
 
 
 61
 The lease, as already shown, was executed May 2, 1947, for a term of five years, and was between the Navy Department, on behalf of the United States of America, and defendant. Defendant, exercising an option contained in the lease, renewed it for an additional five-year term. On April 28, 1954, at the request of the Department of the Army, jurisdiction of the premises was transferred by the Navy Department to the Department of the Army and the lease was formally assigned to it. Defendant was notified of the transfer and tendered rental to the new agency designated.
 
 
 62
 There is no question but that the lease conferred upon the government the power of revocation. The controversy concerns the manner, purpose and by whom such power might be exercised. The government's theory, rejected by the trial Court, is that it could revoke at any time and apparently for any purpose. On the other hand, defendant contends, and the trial Court held, that the lease was revocable only upon "decision by the Secretary of the Navy that such revocation is essential for aviation purposes." It is not disputed on either theory but that the lease could be revoked only in the event of a national emergency, that such emergency had been declared by the President on December 16, 1950, and was in existence at the time of the execution of the lease and still is in existence.
 
 
 63
 The heart of the controversy resides in paragraph 14 of the lease, as follows:
 
 
 64
 "It is understood and agreed that this lease will at all times be revocable at will by the Government upon presentation of notice of cancellation to the Lessee, in writing, sixty (60) days prior to such termination, in the event of default with regard to the covenants and conditions of the lease or in event of a national emergency and a decision by the Secretary of the Navy that such revocation is essential."
 
 
 65
 The italicized language is that of the government, as shown in its brief, and it is upon that clause that reliance is placed. The last word of the paragraph is "essential," and the question at once arises, essential for what? It would only unnecessarily add to the length of this opinion, which at best will be too long, to discuss or analyze the lease in detail. We have carefully studied its terms and we agree with the trial Court that the lease was revocable only upon a decision by the Secretary of Navy that such revocation was essential for aviation purposes. The preamble recited that "Government is the owner in fee simple * * * of the United States Naval Outlying Airfield, Arlington Heights, Illinois," that "because of its strategic value, it is considered essential that the said airfield and the facilities thereon * * * be retained in a stand-by status for post-war use in connection with Naval Aviation activities," that "the Lessee desires to lease the airfield and the facilities thereon for use as an airport and for such other uses as may be necessary or incidental to this purpose," and that such use "will in no wise be detrimental to the present activities of the Navy Department, but is on the contrary deemed to be in the best interest of the Government."
 
 
 66
 The government argues that this preamble portion of the lease is of little or no consequence in evaluating the agreement of the parties as contained in the granting clauses which followed. This argument, however, overlooks the clause which immediately follows the preamble, "Now Therefore, in consideration of the foregoing, and of the covenants and agreements hereinafter mentioned, the Government * * * acting under the direction of the Secretary of the Navy, does hereby grant, rent, lease and demise unto the Lessee * * *." We think this language made the preamble a part of the operative portion of the lease. See Wall v. Chicago Park District, 378 Ill. 81, 37 N.E.2d 752. For this and other reasons which we need not enumerate, we think the word "essential" clearly refers to aviation, the purpose for which the field had been employed and that for which the Navy desired its retention.
 
 
 67
 The government calls our attention to the Act of August 29, 1916, 34 U.S.C.A. § 522, which was replaced by the Act of August 5, 1947, 34 U.S.C.A. § 522a, which it is claimed precluded the Secretary of Navy from entering into a lease other than one "revocable at any time." We have read these provisions and are not convinced that they support the government's contention. It passes all credulity that Congress would require that a lease be revocable at any time irrespective of the conditions existing or the reasons assigned therefor. More importantly, the record shows that the lease was prepared by the Secretary of Navy or his subordinates, and we think it safe to assume that they were aware of their rights under the law and acted accordingly.
 
 
 68
 In view of the holding of the trial Court, which we have sustained, that the government was precluded from relying upon its notice of revocation, we see no point in discussing it. As we have already said, the revocation provision of the lease is now material only as it bears upon the extent of defendant's interest in the leasehold property and consequently the compensation to which it was entitled on its taking by the government.
 
 
 69
 We now come to the government's contention that the Court committed prejudicial error in its rulings on evidence relating to the value of defendant's leasehold interest. What we have heretofore said is dispositive to a considerable extent of the argument on this point. The general rule undoubtedly is that just compensation is to be determined by the fair cash market value of the property at the time of taking. The cases, however, recognize that this rule cannot be adhered to in situations where the property taken is unique. See United States v. Two Acres of Land, 7 Cir., 144 F.2d 207; City of Chicago v. Farwell, 286 Ill. 415, 121 N.E. 795; Sanitary District of Chicago v. Pittsburgh, Ft. Wayne and Chicago Ry. Co., 216 Ill. 575, 75 N.E. 248, and Monongahela Navigation Co. v. United States, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463. Certainly the Court was presented with an extraordinary situation; in fact, we doubt if there is one in the books even closely akin to it. It would be difficult for any court to determine whether each bit of evidence introduced in such a complicated situation was proper. Our consideration of the points argued by the government leads us to the conclusion that the rulings of the trial Court on the admissibility of evidence were as accurate as could reasonably be expected under the circumstances. In any event, it is our view that no prejudicial error was committed on this phase of the case.
 
 
 70
 Lastly, we come to the issue as to the authority or power of the trial Court to increase the verdict of the jury by way of additur. As already noted, the jury fixed the amount of just compensation at the sum of $25,000. The Court allowed additur in the amount of $50,000, and entered judgment for $75,000, together with interest from the date of taking. The government contends that the Court erred in allowing additur and in the allowance of interest on the increased amount of the judgment. As heretofore noted, additur was allowed in response to defendant's motion which prayed "that the Court substantially increase the jury's verdict by an additur and enter an amended judgment for the amount of such increased award consistent with the overwhelming evidence in this case, or in the alternative, grant the defendant a new trial." The additur was allowed without the consent of and over objection by the government.
 
 
 71
 As a basis for its action, the Court entered certain findings of fact, including the following:
 
 
 72
 "1. The government adduced no evidence whatsoever regarding the value of the premises in question on the basis of the leasehold except on the theory that there was a cancellation of the lease which is contrary to the law and the facts.
 
 
 73
 "2. The fair and just compensation for the premises in question is Seventy-five Thousand Dollars ($75,000.00)."
 
 
 74
 While perhaps not relevant to the question for decision we think it should be noted that finding 1 is not supported by the record. The testimony of government's witnesses on the issue of just compensation was not based on the theory that the lease had been cancelled but that its right to revoke was not limited to Naval aviation purposes — in other words, consistent with the government's interpretation of the lease, that it had a right to revoke for purposes other than those of aviation.
 
 
 75
 We also note that defendant has filed a cross-appeal "on the ground that said additur, in view of the evidence, is inadequate and should have been for an amount not less than $117,000.00 and should have resulted in a total judgment of not less than $142,000.00, together with interest from the date of taking of the property being condemned."
 
 
 76
 The government in support of its position relies upon Dimick v. Schiedt, 293 U.S. 474, 55 S.Ct. 296, 79 L.Ed. 603, in which it was held that additur violated the right to a jury trial guaranteed by the Seventh Amendment to the Constitution. That case involved an action for personal injury in which the jury returned a verdict in favor of plaintiff in the amount of $500. Plaintiff moved for a new trial, principally on the basis that the damages allowed were inadequate. The trial Court ordered a new trial unless defendant would consent to an increase of the damages to the sum of $1,500. Defendant consented to the increase, but without consent on the part of plaintiff the Court denied the latter's motion for a new trial and entered judgment for the increased amount. The Supreme Court held that the conditional order of the trial Court violated the Seventh Amendment of the Federal Constitution in respect of the right of trial by jury.
 
 
 77
 Defendant contends that the Dimick case is without application because there is no constitutional right to a jury trial in a condemnation proceeding. Such a distinction was drawn in United States v. Kennesaw Mountain Battlefield Ass'n., 5 Cir., 99 F.2d 830. In this opinion of the Fifth Circuit, the allowance of additur in a condemnation proceeding was approved. This being the only case of which we are aware which affords any support to the action of the Court in the instant matter, we think it deserves some detailed consideration. There, the Court increased the jury verdict of $9,000 to $16,000, by additur. Defendant filed a motion for a new trial and the Court directed that it be allowed unless the government filed its written consent to increase the compensation to $16,000. The government's written consent was given and the motion for a new trial denied. Both sides appealed. The Court of Appeals held that the government could not complain of the allowance of additur because it had consented thereto. The condemnee, relying upon the Dimick case, contended that it had been denied the right to a trial by jury. The Court held that the parties in condemnation had no constitutional right to a jury trial, as was the situation in the Dimick case. The Court then stated (at page 834):
 
 
 78
 "But if we are wrong in this, and the proceeding was a common law action with a jury trial guaranteed under the Seventh Amendment, still the judgment should be affirmed, because it conclusively appears from the record itself, and from the findings of the District Judge, that the trial was not attended with any error for which a new trial at common law ought to have been granted."
 
 
 79
 Thus, in Kennesaw, the condemnor, the party burdened by the allowance of additur, expressly consented thereto, while the condemnee opposed its allowance and urged its motion for a new trial.
 
 
 80
 In the instant case, the condemnor, the party burdened by the allowance of additur, objected thereto, while plaintiff requested a new trial only as an alternative to its motion for the allowance of additur. The facts of the two cases are similar in one respect, that is, in both, the condemnee had no basis for a new trial other than that the amount of just compensation filed by a jury was inadequate. The Court of Appeals, in Kennesaw (99 F.2d at page 833), agreed with the District Court that "the condemnor could not complain of the additur, because it had consented to it; the owner could not complain of it, because, there being no ground for a new trial, the addition to the verdict was in his favor."
 
 
 81
 We doubt if the Court in Kennesaw, absent consent on the part of the condemnor, would have approved additur. In both Dimick and Kennesaw, the complaining party was the one in whose favor additur had been allowed. In both cases the complaining parties refused to agree to additur but demanded a new trial. In Dimick, the Supreme Court ruled additur improper on the basis that the non-consenting party had a constitutional right to a jury trial. In Kennesaw, the Court held (1) that the non-consenting party had no constitutional right to a jury trial, and (2) that there was no error in the trial for which a new trial should have been granted.
 
 
 82
 We need not take issue with the holding in Kennesaw to reach the conclusion that it is without application in the instant situation. Here, additur was allowed at the request of defendant and over objection of the government. The theory of additur is a corollary to that of remittitur, the former to increase an inadequate verdict, the latter to decrease an excessive verdict. It is a universal rule, so far as we are aware — in fact, the parties in the instant action so agree — that a remittitur may not be granted by a court in lieu of a new trial unless consented to by the party "unfavorably affected thereby." Even though made in a different setting, we think a statement by the Court in Dimick is pertinent. The Court stated (293 U.S. 474, 487, 55 S.Ct. 296, 301, 79 L.Ed. 603):
 
 
 83
 "It is worthy of note that, while for more than a century the federal courts have followed the approved practice of conditioning the allowance of a new trial on the consent of plaintiff to remit excessive damages, no federal court, so far as we can discover, has ever undertaken similarly to increase the damages, although there are numerous cases where motions for new trial have been made and granted on the ground that the verdict was inadequate." We agree that parties to a condemnation suit have no constitutional guarantee of a jury trial but, even so, it does not follow that the Court, absent consent of the parties, has the authority to increase a jury verdict by additur or decrease it by remittitur. Rule 71A(h) of the Federal Rules of Civil Procedure, 28 U.S.C.A. provides:
 
 
 84
 "* * * any party may have a trial by jury of the issue of just compensation by filing a demand therefor * * * unless the court in its discretion orders that, because of the character, location, or quantity, of the property to be condemned, or for other reasons in the interest of justice, the issue of compensation shall be determined by a commission of three persons appointed by it."
 
 
 85
 A jury trial was ordered in the instant case, the main and perhaps sole purpose of which was, as heretofore shown, to determine just compensation for the leasehold interest sought to be taken. The trial was conducted, so we think and hold, free from prejudicial error. We are not able to embrace any logical or reasonable theory by which the Court was authorized to substitute its judgment on the issue of just compensation for that of the jury, absent consent of the parties. If Congress had intended that just compensation be determined by the Court, it could have easily so provided. If the Court has such authority, the right to a jury trial when awarded is little more than an empty gesture. The jury is stripped of the fact-finding characteristics inherent in the traditional jury trial and its function becomes nothing more than advisory.
 
 
 86
 It is our judgment, and we so hold, that the trial Court, under the circumstances, was without authority to increase the jury verdict by additur. It necessarily follows that there is no merit in defendant's cross-appeal. The judgment is reversed and the cause remanded, with directions that judgment be entered on the jury verdict in favor of defendant, together with interest thereon from the date of taking. This direction is without prejudice to the right of the Court to allow defendant's alternative motion for a new trial.
 
 
 87
 FINNEGAN, Circuit Judge (dissenting).
 
 
 88
 Since it is my view that this lease had been revoked, I am unable to agree with the majority opinion.